Present:  All the Justices

MARY H. NICHOLS

OPINION BY JUSTICE A. CHRISTIAN COMPTON
v.  Record No. 981388                    April 16, 1999

KAISER FOUNDATION HEALTH PLAN
OF THE MID-ATLANTIC STATES, INC.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Jane Marum Roush, Judge

Appellant Mary H. Nichols, the plaintiff below, had been a patient and subscriber since at least 1990 of appellee Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc., a defendant below.  Kaiser operated various medical facilities available to its subscribers, including pharmacies at Falls Church and Reston staffed by its employees.

In this action for damages, the plaintiff alleged that while being seen by a Kaiser physician in April 1995 for respiratory disease she was given a prescription for medrol, a steroid medication.  The plaintiff further alleged that the prescription was filled at Kaiser's pharmacy at Falls Church and refilled at Kaiser's pharmacy at Reston during that month.  She also alleged that, without her knowledge, the pharmacies negligently provided the wrong medication, namely dexamethasone, a steroid five times more potent than medrol.

The plaintiff further alleged that in May 1995 she discontinued taking the wrong medication and resumed taking the

correct medication.  Thereafter, plaintiff alleged, she was treated by Kaiser's physicians in an effort to relieve the pronounced side effects she suffered from taking the wrong medication.

The plaintiff also alleged that Kaiser's pharmacy employees failed to comply with the applicable standard of care in the dispensing of her prescriptions.  As a result, plaintiff alleged, she has suffered permanent injury, sustained expense, and incurred other losses, for which she sought recovery in damages.

In a grounds of defense, Kaiser admitted responsibility for the conduct of its pharmacy employees who, acting within the scope of their employment, dispensed medication to the plaintiff.  Kaiser also admitted that plaintiff had erroneously been given dexamethasone, as alleged.  Kaiser denied, however, that the negligence of its employees proximately caused the injuries and damages alleged by plaintiff.

In a March 1998 jury trial, the defendant moved to strike the plaintiff's evidence both at the conclusion of the plaintiff's case-in-chief and at the conclusion of all the evidence.  The grounds of the motions were, first, that the plaintiff had not presented any expert testimony that the pharmacists had breached the applicable standard of care and, second, that the plaintiff failed to present expert testimony of

causation, viz., that her "complaints were as a result of taking dexamethasone."

The trial court denied the motions on the first ground, ruling expert testimony was unnecessary because a jury could understand, without the aid of such testimony, that dispensing wrong medication is a breach of a pharmacist's standard of care. The court took the second ground of the motions under advisement, stating it was "concerned with the causation testimony."

The jury found for the plaintiff, fixing her damages at $75,000. The defendant renewed its motion to strike the plaintiff's evidence and moved the court to set the verdict aside.

Following briefing and argument upon the motions, the court granted them "on the basis there was insufficient expert evidence of causation." We awarded the plaintiff this appeal from the April 1998 final judgment entered in favor of the defendant.

The sole question presented is whether the trial court erred in ruling there was insufficient expert evidence of causation to present an issue for the jury.

Settled principles guide our consideration of the facts. "When the verdict of a jury has been set aside by the trial court, the verdict is not entitled to the same weight upon

3

appellate review as one that has received the trial court's approval. But in considering the facts under these circumstances, the appellate court will accord the plaintiff benefit of all substantial conflicts in the evidence and all reasonable inferences that may be drawn from the evidence." Commercial Bus. Sys., Inc. v. Halifax Corp., 253 Va. 292, 296, 484 S.E.2d 892, 894 (1997).

There are few conflicts in the evidence. The plaintiff's medical evidence was presented through the testimony of Kaiser employees supplemented by her Kaiser medical records. The focus of the controversy is upon the two-month period of April-May 1995.

The plaintiff's principal witness was Dr. Ronald J. Klayton, a Kaiser physician specializing in internal medicine with a subspecialty in pulmonary diseases. He first treated her on March 15, 1995 because her regular pulmonary physician was on vacation. The plaintiff, born in 1932, came for treatment of lung disease and sinus drainage.

The plaintiff's medical records, examined by Klayton, revealed that her lung disease had been "severe in nature." At the time, the plaintiff was taking a number of medications including the steroid medrol, 16 milligrams (mg) per day, and two other steroids. Following an examination of plaintiff,

4

Klayton concluded she "had severe chronic obstructive pulmonary disease."

During the first visit, Klayton advised her to double the dose of medrol to 32 mg per day. He increased the dosage of some of her other medications and prescribed an antibiotic. Klayton understood that plaintiff had been taking various doses of either medrol or prednisone, another steroid, for two or three years.

On March 22, plaintiff returned to see Klayton. She was "feeling better" and Klayton felt that her lung disease had improved due to the increase of the medrol dose and institution of the antibiotic. During that visit, the medrol dose was reduced to 28 mg per day and she was started on another medication to help loosen thick secretions.

On April 5, Klayton's "initial prescription" for medrol 4 mg tablets was filled for plaintiff at Kaiser's Falls Church pharmacy. It was filled correctly as medrol but it was entered into the pharmacy computer system incorrectly as dexamethasone 4 mg tablets. When plaintiff refilled the prescription on April 13 at Kaiser's Reston pharmacy, dexamethasone was dispensed, and plaintiff began taking it. That medication is "about five times as potent" as medrol, according to Klayton.

Plaintiff saw Klayton on April 5 and May 3. On May 3, he diagnosed her as "having diabetes secondary to steroids."

5

Klayton was unaware that plaintiff was "on dexamethasone." According to Klayton's review of plaintiff's medical record, prior to April 5 no physician had noted in writing in the record a diagnosis of diabetes nor had any physician indicated in writing in the record that he had undertaken to actively treat her for diabetes.

On May 3, plaintiff "was upset over some bruises on her skin" and Klayton observed "a hemorrhage underneath the skin. It looks like a black and blue mark." Plaintiff's glucose level was 314 according to one test and 392 according to another. The "normal range" for a person like plaintiff was 118 and her readings were "way too high," according to Klayton. He immediately began treating plaintiff's diabetes and asked that she return to see him the next day.

Upon plaintiff's return on May 4, Klayton learned that she had been taking dexamethasone. He said she was taking 16 mg of dexamethasone and getting the equivalent of 80 mg of medrol.

On that date, he noted in her record an "assessment" of "dexamethasone induced hyperglycemia." He testified: "I thought that the dexamethasone had induced her high blood sugar." Elaborating, the physician stated: "I meant that she had what's called secondary diabetes. In this case, secondary to the use of a steroid."

6

Klayton was asked: "So you assessed her as having a high sugar level because of the dexamethasone she was taking?" He answered: "Because that was the steroid she was taking. I mean if she was on Medrol I would have blamed it on that. They both can do it. But she was on dexamethasone."

Klayton was asked to describe the side effects he noticed "as a result of the amount of dexamethasone she was taking if she was substituting one dexamethasone tablet for one Medrol tablet" for the period of time in question. He responded that "the side effects are identical. It's only because she was on dexamethasone that we can say they were due to the dexamethasone."

Klayton then described the following side effects experienced by plaintiff: Bruising, elevated blood sugar, being emotionally distraught and depressed, difficulty in sleeping, leg weakness, hip pain upon movement, swelling of her body, extreme thinning of skin, and appearing "cushingoid." Klayton described plaintiff's cushingoid appearance: "It's a plethoric face. Weight primarily central, with thin arms and legs. And there tends to be a deposition of fat over the upper part of the back."

There was no reference in the plaintiff's medical record from January 1, 1995 through April 4, 1995 "where a physician at Kaiser assessed her as being cushingoid." On April 14, 1995, a

7

Kaiser physician had written in her record, "Appears cushingoid."  There was no reference in her record prior to April 5 "where a physician ha[d] made a physical exam and noted the extreme thinning of her skin."

On May 4, Klayton asked plaintiff to "restart the Medrol in a dose of 16 milligrams a day and stop the dexamethasone."  He examined her on May 8, May 10, and May 15.

On May 8, her blood sugar reading was 303 and her diabetes "wasn't doing well."  On May 10, her blood sugar reading was "down to 144 . . . just getting close to the normal of 118."  On May 15, her diabetes was "well controlled."  Plaintiff's last visit to Klayton was on May 24, 1995; she "had a very prominent cushingoid appearance."

The plaintiff, a school teacher, testified that:  "Once I got this wrong medication, this is when all these problems started coming up one after another."  She stated that during the period from January to the end of March 1995, she "was doing very good, except I usually would get sinus infections or bronchitis.  And then it would go to asthma."  She was "doing great" emotionally, she said.

She was asked to describe changes that took place in her physical condition from April through the first few days of May 1995.  She testified that she "became very hyper," that she could not "seem to sit down at all," that she could not sleep at

8

night, that she "started noticing this huge round face and these big lumps on my neck," that her "stomach just started to protrude," that she gained weight, that her "skin would just split," and that she began "getting all these marks if I would just bump against anything." She testified that "all this started happening" at "the end of April."

The plaintiff's son testified he saw his mother, who lived alone, at least weekly from 1994 through March 1995. According to the son, during this period she was "fine" and worked daily "at the schools," she "seemed healthy," and she was "very happy" emotionally.

The son testified he observed his mother weekly during the period April-May 1995. He corroborated the plaintiff's testimony about the changes in her physical and emotional condition during that period, adding that she began growing facial hair.

The defendant presented the testimony of Kaiser physicians who had treated the plaintiff from 1990 through 1996. In sum, this testimony, as well as her medical record during that period, revealed a continuing problem with emphysema (chronic obstructive pulmonary disease) and chronic sinusitis. She had been smoking one pack of cigarettes daily for 40 years.

In July 1991, a physician noted she had "[t]rouble with steroids." In October 1992, a physician noted she was taking

prednisone ("an oral steroidal medication"), was having difficulty sleeping, and was feeling "hyper." In November 1992, a physician noted the plaintiff "was still smoking." In January 1993, a physician found that plaintiff "has a lot of side effects from taking Prednisone" such as "restlessness, insomnia, [and] becoming hyper."

On August 16, 1993, plaintiff was prescribed medrol for the first time, to replace prednisone. Several days later, her physician decreased the dose of medrol from 40 mg to 32 mg daily because she was "tolerating" the medication and "feeling much better;" she was experiencing no "unpleasant side effects."

In April 1994, a physician noted plaintiff had gained weight after having stopped smoking during the previous September. In May 1994, plaintiff had been taking medrol 48 mg daily for four days and reported complaints of "bloating" and "being moody."

During the last six months of 1995 and during 1996, plaintiff's physicians were of the opinion "that she developed the diabetes or high glucose condition due to steroid." She had become "steroid dependent" due to her lung disease because "her condition would aggravate if she would try to come off the steroid." She continued to exhibit many of the side effects associated with steroid use to the time of trial.

On appeal, urging affirmance of the judgment below, defendant bases its argument on what it says is the following question presented: "Is expert testimony required to differentiate between the effects of taking dexamethasone in an unknown quantity for an unknown number of days and the effects related to continuing on medrol on a daily basis for at least ten months, or is the difference sufficiently obvious to be within common knowledge?" That is not the question presented.

Furthermore, the defendant builds its argument on a contention never made in the trial court. Defendant argues "[t]here was no evidence and no one knows how many of the wrong pills Nichols took between April 13 and May 4, 1995, when the error was discovered." Thus, defendant contends, "the jury was forced to render a judgment based upon whatever they speculated was the amount of dexamethasone consumed by Nichols." This argument was not made in the trial court and we will not consider it for the first time on appeal. Rule 5:25. Indeed, the record establishes the plaintiff ingested at least 183 dexamethasone tablets during the 21-day period in question, an average of about nine pills per day.

The proper question to be decided, as we have said, is whether the trial court erred in ruling there was insufficient expert evidence of causation to present an issue for the jury.

On the subject of causation, this case is a hybrid as it

relates to the necessity of presenting expert testimony in matters strictly involving medical science as opposed to accepting testimony of lay or nonexpert witnesses who are familiar with a person whose physical condition is in question. See, e.g., Raines v. Lutz, 231 Va. 110, 113, 341 S.E.2d 194, 196 (1986) (expert testimony ordinarily necessary to establish that health care provider's deviation from standard of care was proximate cause of claimed damages); Todt v. Shaw, 223 Va. 123, 127, 286 S.E.2d 211, 213 (1982) (lay testimony of causal connection between automobile accident and injury admissible even when medical testimony fails to expressly establish such connection); Roll 'R' Way Rinks v. Smith, 218 Va. 321, 330-32, 237 S.E.2d 157, 163-64 (1977) (causal connection between accident and permanent disability factual matter for jury even though medical testimony never "formally pronounced" such connection); and Pepsi-Cola Bottling Co. v. McCullers, 189 Va. 89, 97-98, 52 S.E.2d 257, 260-61 (1949) (opinions of lay witnesses on causation generally limited to opinions upon physical condition and may not extend to matters determinable only through peculiar experience, knowledge, and training of a physician).

Here, plaintiff did not present expert testimony in the strict sense of that term, that is, a witness was not formally qualified who responded to hypothetical questions.

Nevertheless, there was abundant opinion testimony from plaintiff's treating physicians, particularly Dr. Klayton. In addition, lay testimony was offered from the plaintiff and her son upon the plaintiff's physical and emotional condition as it appeared before and after the critical April-May 1995 period.

Consequently, the case reduces to whether there was sufficient evidence, comprised of medical opinion and lay testimony, to present a jury question on causation. We answer that query in the affirmative; testimony from a "pure" expert witness was unnecessary.

The evidence showed that, prior to April 1995, plaintiff had suffered from a severe respiratory disease for at least five years. She had been taking various steroid medications during the five-year period and had experienced side effects to a moderate degree sporadically during that time. She took medrol for the first time on August 16, 1993. Over the next 20 months until April 1995, she used medrol in varying doses and tolerated the medication with few unpleasant side effects even though she had a history of "trouble" with steroids. From January 1995 to April 1995, she was "doing very good" physically, except for her respiratory condition, and "doing great" emotionally.

Then, her health worsened dramatically. On April 13 she began taking dexamethasone, a steroid five times as potent as medrol, which Kaiser's Reston pharmacy negligently had furnished

13

her on that day.  The very next day, April 14, she appeared cushingoid to a Kaiser physician.  Her side effects were exacerbated and multiplied to a degree more severe than ever before.  She testified that once she "got this wrong medication, . . . all these problems started coming up one after another." She said that "all this started happening" at "the end of April."

On May 3, after taking heavy doses of the wrong medication for 20 days, Klayton found her glucose level was "way too high." The next day, May 4, Klayton discovered plaintiff had been on the wrong medication.  He was of the opinion that plaintiff suffered from "dexamethasone induced hyperglycemia" and that "the dexamethasone had induced her high blood sugar," as well as the other severe side effects enumerated in his testimony.

This evidence, and the other facts in the trial record, were sufficient to present a question for the jury upon whether the defendant's negligence caused the effects of which the plaintiff complains.  One moment she was relatively well and the next moment she was ill; intervening between those two conditions was defendant's negligence.  Thus, medical facts and medical opinion combined with lay testimony, without the addition of "pure" expert testimony, entitled the plaintiff to have a jury weigh the evidence of causation, and the trial court erred in ruling to the contrary.

14

Hence, the judgment below will be reversed, the verdict of the jury will be reinstated, and final judgment on the verdict will be entered here.

Reversed and final judgment.