Present:  All the Justices

FEDDEMAN & COMPANY, C.P.A., P.C.

v.  Record No. 991996     OPINION BY JUSTICE ELIZABETH B. LACY
                                          June 9, 2000
LANGAN ASSOCIATES, P.C., ET AL.

            FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                        Alfred D. Swersky, Judge

    Feddeman & Company appeals a judgment setting aside a

$3,300,000 jury verdict in its favor against six of its former

employees and one of its competitors.  Feddeman & Company, the

plaintiff below, is a certified public accounting firm that,

in 1997, had 31 employees and over $3,000,000 in yearly

revenues.  W. Kent Feddeman was a 95% shareholder and the

president of the company.

    The defendants are Langan Associates, a rival accounting

firm, John P. Langan, its president, three former directors

and employees of Feddeman & Company, Joseph M. Kotwicki,

Cheryl L. Jordan, and J. Andrew Smith, and three former

employees of Feddeman & Company, Nathaniel T. Bartholomew,

Robert A. Casey, and John G. Wooldridge.

    The events giving rise to this litigation began in August

1996, when Kent Feddeman initiated discussions with John

Langan regarding a possible buyout or merger of the two

companies.  In early 1997, Feddeman asked Kotwicki to take

over the negotiations.

In the summer of 1997, the American Express Company made an offer to purchase both Langan Associates and Feddeman & Company. On August 31, 1997, Langan, Kotwicki, Bartholomew, Smith, Casey, Wooldridge, and Jeffrey S. Tenenbaum, Langan Associates' attorney, met in Tenenbaum's office. At this meeting, the attendees determined that they would refuse the American Express offer, and Kotwicki, Smith, Bartholomew, Casey, and Wooldridge would form a "Buying Group." The Buying Group planned to purchase Feddeman's 95% interest in Feddeman & Company and then merge the company with Langan Associates. The Buying Group also raised the possibility that they might have to resign from Feddeman & Company if the buyout negotiations were unsuccessful. The members of the Buying Group signed a retainer agreement with Tenenbaum authorizing him to represent them. At this meeting, or shortly thereafter, Kotwicki gave sample Feddeman & Company engagement letters and nonsolicitation agreements, along with other corporate and employment documents, to Tenenbaum in preparation for the merger. Feddeman was aware of and did not oppose this two-step merger process.

On September 29, 1997, the Buying Group offered Feddeman $2,000,000 for his interest in Feddeman & Company. In making the offer, Kotwicki reminded Feddeman that the corporate

directors were not bound by noncompete agreements and that they were free to leave Feddeman & Company if they wished.

On November 4, 1997, Feddeman made a counteroffer to the Buying Group. Four days later, Kotwicki told Feddeman that the counteroffer nullified the Buying Group's prior offer, and that if the Buying Group were to make another offer, it would be lower than the first.

On November 10, 1997, a second meeting was held at the offices of Langan Associates, again with Langan, Tenenbaum, and the Buying Group. Tenenbaum had been asked to do legal research on any potential liability which could arise if the Buying Group resigned and were subsequently employed by Langan Associates. Based on his research, Tenenbaum advised the Buying Group that to avoid liability, if they ultimately chose to resign, they should not solicit Feddeman & Company clients or employees until after their resignation, not use company resources in the preparation of their resignations, not make negative or adverse statements about Feddeman & Company, and not remove any company property. The Buying Group agreed that they would resign on December 1, 1997 if they "hadn't made a deal" with Feddeman and that the resignations "would be a form of leverage that could be used" in the negotiations.

On November 12, 1997, at 7:00 a.m., Jordan, the members of the Buying Group except Casey, and four other Feddeman &

3

Company senior employees met at Smith's house.  At this meeting, the Buying Group reported on the status of the merger negotiations, and indicated that if the negotiations did not improve there was a possibility that the Buying Group would resign on December 1, 1997.  The Buying Group indicated that they believed Langan Associates would hire them if they resigned.  They also told the senior employees present that they "would take care of them."

On November 19, 1997, Kotwicki again discussed the resignation plan with Jordan.  She indicated that she would be on vacation on December 1, so Kotwicki gave her a letter of resignation drafted for her by Tenenbaum, which she signed and gave to her own attorney.

On November 24, Feddeman's attorney presented Kotwicki with a $4,000,000 stock purchase proposal in which Feddeman would be paid over the course of eight years.  Two days later, the Buying Group made a counteroffer of $4,000,000 to be paid over a ten year period, with no personal guarantees and a covenant not to compete from Feddeman.

Meanwhile, Feddeman learned of the proposed walkout and contacted Johnson & Lambert, a national accounting firm, to see if it could provide assistance if needed, and additionally to discuss possible merger options.

4

On December 1, 1997, Feddeman announced to some of his employees that Johnson & Lambert had expressed interest in making a presentation to Feddeman & Company employees on December 3.  The Buying Group met with Feddeman immediately after this announcement.  Feddeman told them Johnson & Lambert had an interest in acquiring the firm, and that there would be positions for everyone.  The Buying Group met with Feddeman a second time in his office, this time without Kotwicki.  They questioned the potential merger with Johnson & Lambert and its impact on the planned buyout and merger with Langan Associates.  Feddeman told them he just wanted them to hear of another opportunity and he advised them to talk to his lawyer.

Following the meetings with Feddeman, members of the Buying Group met at lunch and decided to resign.  They planned to talk to the senior managers after work to inform them of the resignation decision.  After lunch, Kotwicki called Langan, informed him that the Buying Group was resigning, and asked if Langan Associates would hire the Buying Group and any others who might resign.  Langan agreed.

Kotwicki had letters of resignation prepared for three senior employees, Mary D. Komatsoulis, James B. Kanuch, and Mike A. Benoudiz.  That evening, after attending an event with Feddeman, Benoudiz and Kanuch met with Smith and were given the prepared letters of resignation.  They were told of the

5

Buying Group's decision to resign and to work for Langan Associates, and that "they could come too." Smith, Benoudiz, and Kanuch returned to the office, and while Smith gathered his personal effects, Benoudiz and Kanuch signed their letters of resignation and gave them to Smith. That evening Komatsoulis, at Bartholomew's request, met with him. After the meeting, Komatsoulis returned to the office and signed her letter of resignation. A fourth employee was told to contact Kotwicki because he had a letter of resignation for her to sign.

That evening, Kotwicki called Jordan, who contacted her attorney and instructed him to release her letter of resignation. Kotwicki also obtained a letter of resignation from his son, Michael Kotwicki, a Feddeman & Company employee.

The next morning, December 2, prior to going to work, Kotwicki went to Smith's house and collected the letters of resignation obtained from various employees. After leaving Smith's house, Kotwicki delivered 11 letters of resignation to Kent Feddeman. Feddeman accepted the resignations.

That evening, Langan Associates held a reception for the Feddeman employees who had not yet resigned. Eventually, 25 of the 31 Feddeman & Company employees resigned and began working for Langan Associates. By December 3, all the Feddeman & Company clients had been contacted by employees of

6

Langan Associates, and 50% of those clients eventually transferred their business to Langan Associates.

On April 9, 1998, Feddeman & Company filed an Amended Motion for Judgment asserting inter alia the following causes of action:  Count I - Breach of Fiduciary Duty by Director Defendants, Count II - Usurpation of Corporate Business Opportunity as to Director Defendants and Employee Defendants, Count III - Breach of Fiduciary Duty of Employee Defendants, Count IV - Intentional Interference with Contract and Business Expectancies By All Defendants, and Count VI – Violation of Va. Code §§ 18.2-499 and –500, Conspiracy to Injure Another in Trade or Business, By All Defendants.  Count V was dismissed by the trial court upon defendants' Plea in Bar.

The defendants filed a counterclaim which alleged intentional interference with contractual rights and prospective economic advantage, unfair competition, and libel and slander.

Following a seven-day trial, the jury returned a verdict in favor of Feddeman & Company and against the defendants on all remaining counts in the Amended Motion for Judgment, with one exception.  Cheryl Jordan was found not to have usurped a corporate business opportunity.  The jury awarded damages in the amount of $3,300,000.  The jury found in favor of the plaintiff on defendants' counterclaim.

The defendants filed a Motion To Strike and To Set Aside the Verdict and, following further briefing and argument, the trial court granted that motion. Feddeman & Company filed this appeal, and the defendants assigned cross-error.

I.

On appellate review of the trial court's action setting aside the verdict, we consider whether there was sufficient credible evidence to establish the claims against the defendants, and we consider the evidence and reasonable inferences therefrom in the light most favorable to the plaintiff. Nichols v. Kaiser Foundation Health Plan, 257 Va. 491, 494, 514 S.E.2d 608, 609 (1999); Carter v. Lambert, 246 Va. 309, 313-14, 435 S.E.2d 403, 405-06 (1993).

In Counts I and III of the Motion for Judgment, the plaintiff claimed that defendants Kotwicki, Smith, Jordan, Casey, Bartholomew, and Wooldridge breached their fiduciary duties to the corporation. In setting aside the jury's verdicts in favor of the plaintiff on Counts I and III, the trial court concluded that these defendants did not breach their fiduciary duties because they were entitled to engage in "reasonable preparations to compete within certain limitations."

We agree that, prior to resignation, these defendants were entitled to make arrangements to resign, including plans

8

to compete with their employer, and that such conduct would not ordinarily result in liability for breach of fiduciary duty. However, the right to make such arrangements is not absolute. This right, based on a policy of free competition, must be balanced with the importance of the integrity and fairness attaching to the relationship between employer and employee or corporation and corporate director. Science Accessories Corp. v. Summagraphics Corp., 425 A.2d 957, 962-63 (Del. 1980); Maryland Metals, Inc. v. Metzner, 382 A.2d 564, 568 (Md. 1978). Under certain circumstances, the exercise of the right may constitute a breach of fiduciary duty. Restatement (Second) of Agency § 393 cmt. 1 (1957).

Liability for breach of fiduciary duty has been imposed when the employees or directors misappropriated trade secrets, misused confidential information, and solicited an employer's clients or other employees prior to termination of employment. See, e.g., Maryland Metals, and cases cited therein. Whether specific conduct taken prior to resignation breaches a fiduciary duty requires a case by case analysis.

In Duane Jones Co. v. Burke, 117 N.E.2d 237 (N.Y. 1954), certain officers, directors, and employees of an advertising agency "met and agreed to take over the business" of their employer "either by purchase of the controlling interest in the corporation or by resignation en masse and the formation

9

of a new agency." Id. at 245. The employees presented a purchase offer for the controlling interest in the agency and told the majority stockholder, who was also president of the agency, that if the offer was not accepted, the employees would resign. The offer was rejected and shortly thereafter the members of the group submitted resignations on the same day in substantially identical form. A new advertising agency was formed and, within a month, the new agency had acquired 9 of the approximately 25 clients formerly serviced by the old company, Duane Jones Co., and had acquired more than 50% of that agency's personnel. The evidence also showed that the new agency acquired certain clients and employees through the action of the defendants while those defendants were completing their duties with their former employer, although the defendants had already stated their intention to resign. Id.

In approving the jury verdict in favor of the plaintiff, the Court of Appeals of New York concluded that each of the defendants was required to " 'exercise the utmost good faith and loyalty in the performance of his duties' " and that their conduct " 'fell below [that] standard.' " Id. at 245.

Similarly in ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc., 413 N.E.2d 1299 (Ill. App. 1980), the court found that the coordinated resignation of key

management employees pursuant to their organized plan resulting in "the sudden, potentially crippling loss of half of [the employer's] business and major customers, as well as substantial numbers of its personnel" was an actionable breach of fiduciary duty. Id. at 1306.

The evidence in the instant case is substantially similar to that in the Duane Jones case. Here, the employee and director defendants met and formulated a plan to resign en masse if Kent Feddeman rejected their buyout offer, knowing that a resignation or walk out by all of them would "be devastating to" the corporation. The plan included anticipation of future employment with Langan Associates, a rival business, and such future employment included securing plaintiff's clients and employees as clients and employees of Langan Associates. The record shows that these defendants informed other employees of the plan to resign, supplied resignation letters for use by other employees, and told employees that they were "going to go join John Langan, and they could come too."

A total of 11 resignations were submitted on December 2 and, within four days, a total of 25 of the plaintiff's 31 employees resigned and joined Langan Associates. By December 5, all of the plaintiff's clients had been solicited to join

11

Langan Associates and approximately half of those clients eventually moved their accounts to Langan Associates.

In considering this evidence, the jury was instructed that employees and directors of a corporation are required to "exercise the utmost good faith and loyalty" toward the corporation and may not act "in a manner adverse to the corporation's interest."  The jury was also told that corporate directors, while employed by the corporation, could inform other employees of their intent to leave the corporation, but could not solicit such employees to join them in a rival business and could not use confidential or proprietary information.

The evidence shows that these defendants did more than prepare to leave their employment and advise others of their plan.  As in Duane Jones, the totality of the defendants' actions provided credible evidence to support a jury determination that their conduct fell below the required standard of good faith and loyalty and constituted a breach of fiduciary duty.  Therefore, the judgment of the trial court setting aside the jury verdict in favor of plaintiff on Counts I and III was error.

## II.

Count VI of the Motion for Judgment charged that the employee and director defendants, along with Langan Associates

12

and John P. Langan, individually, violated Code §§ 18.2-499 and -500 because these defendants, intentionally and without legal justification, conspired to injure plaintiff's business and, as a result of that conspiracy, plaintiff suffered financial harm. The jury was instructed that to prevail on this count, the plaintiff had to prove by clear and convincing evidence that these defendants combined for the purpose of willfully and maliciously injuring plaintiff's business and that the business was injured as a result of these actions. The jury was further told that

> [t]he term 'malice' means that the defendants acted intentionally, purposefully and without legal justification. Without legal justification may include a breach of their fiduciary duty or assisting someone to breach their fiduciary duty. Should corporate officers or directors act in concert to breach their fiduciary duties and cause injury to the corporation, they may be liable for conspiracy. The term 'malice' does not require the plaintiff to prove that a conspirator was motivated by hatred, personal spite, ill will or a desire to injure the plaintiff.

The jury returned a verdict finding that all corporate director and employee defendants as well as John Langan and Langan Associates violated §§ 18.2-499 and -500. The trial court set aside the jury verdict, finding that there was no evidence that these defendants "combined with an intent to injure" plaintiff and that there was no evidence of "unlawful acts in furtherance of the combination."

13

The plaintiff contends that the jury's finding of conspiracy was supported by evidence that John Langan and the members of the Buying Group met on August 31, November 10, and November 12 and formulated a plan to impose "leverage" on Feddeman to accept the buyout offer. The plan was that the members of the Buying Group would resign en masse if Feddeman refused the buyout offer and, with Langan's agreement, go to work for Langan Associates. Jordan, although not a member of the Buying Group, was told of and agreed to participate in the resignation plan. The plan also included securing the resignations of other senior employees, whom John Langan also agreed to hire.

The plaintiff maintains that Langan Associates' participation in the conspiracy is shown by evidence that its legal counsel represented the Buying Group, advised the Buying Group regarding the resignation and solicitation of other employees and clients of the plaintiff, drafted Jordan's resignation letter, and was paid for these services by Langan Associates.

Establishing a conspiracy in violation of §§ 18.2-499 and -500 does not require proof that the conspirators' "primary and overriding purpose is to injure another." Advanced Marine Enterprises v. PRC Inc., 256 Va. 106, 117, 501 S.E.2d 148, 154 (1998). As indicated in the instruction given to the jury in

this case, the plaintiff was only required to show that the defendants acted "intentionally, purposefully, and without lawful justification."  Id., 501 S.E.2d at 154-55.

The trial court concluded that the defendants' actions were undertaken for no other purpose than "to effectuate the planned merger."  However, considering the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff, as we must, we find that this conclusion was error.

The evidence is clear that the plan to submit resignations was initiated as a means of exerting leverage against Feddeman to accept the Buying Group's offer and thus facilitate a merger of plaintiff with Langan Associates.  This plan was based on the principle that the departure of the defendants and the other employees would so adversely impact the plaintiff that Feddeman would not accept those resignations and let the employees depart.  Injury to the plaintiff was a known and intended result of the plan.  The employee and director defendants cannot avoid responsibility for their actions because their resignation plan was not their first or preferred choice of action.  The evidence in this case is clearly sufficient to support a jury determination, not only that the defendants acted intentionally and

15

purposefully, but that they knew and intended that their resignation plan, if implemented, would injure the plaintiff.

This knowledge was not limited to the employee and director defendants. John Langan and Langan Associates were aware that the resignation plan was considered "leverage" and that, if implemented, would adversely affect the plaintiff. Langan and Langan Associates facilitated development of the plan by providing legal services and agreeing to hire plaintiff's former employees.

The evidence also supports a jury determination that the defendants' actions were without legal justification. The jury was instructed that the failure of legal justification "may include a breach of their fiduciary duty or assisting someone to breach their fiduciary duty." As discussed above, the evidence was sufficient to support a jury finding that the planned resignation en masse from Feddeman & Company was a breach of the director and employee defendants' fiduciary duties. The evidence was also sufficient to show that the conduct of John Langan and Langan Associates assisted the director and employee defendants in the breach of their fiduciary duties. Applying the jury instruction to this evidence, we find there was sufficient credible evidence for the jury to conclude that the defendants' actions were without legal justification.

16

Accordingly, the trial court erred in setting aside the jury verdict in favor of the plaintiff on Count VI.

III.

The plaintiff sought compensatory damages for a single injury resulting from the various causes of action and the jury awarded a single damage amount of $3,300,000.  In light of our holding that the trial court erred in setting aside the jury verdict in favor of the plaintiff on the breach of fiduciary duty counts, and the statutory conspiracy count, it is unnecessary to consider the plaintiff's assignments of error regarding the trial court's action in setting aside the jury's verdicts on the intentional interference with contract and business expectancy and usurpation of corporate opportunity.[1]  However, the defendants argue that, even if the trial court erred in setting aside the jury verdict, final judgment should not be entered in favor of the plaintiff, because the trial court erred in instructing the jury.

In an assignment of cross-error, the defendants assert that the trial court erred when it refused two jury instructions offered by the defendants concerning breach of

---

[1] We also note that usurpation of corporate business opportunity is generally considered a breach of fiduciary duty rather than conduct constituting a distinct cause of action. Trayer v. Bristol Parking, Inc., 198 Va. 595, 603-04, 95 S.E.2d 224, 230 (1956); Meiselman v. Meiselman, 309 N.C. 279, 306-08, 307 S.E.2d 551, 567 (N.C. 1983).

fiduciary duty.  The trial court stated that it would not give these two instructions because the matters they addressed were covered in other instructions.  Additionally, the trial court observed that other instructions adequately set out the elements of the cause of action and that one of the instructions "sounds like [defendants'] closing argument."

We agree that the proposed instructions were cumulative of other instructions given on this issue.  While a party is entitled to jury instructions supporting his theory of the case, if supported by adequate evidence, a trial judge is not required to give proffered jury instructions which are cumulative or repeat matters contained in other instructions. Medlar v. Mohan, 242 Va. 162, 168-69, 409 S.E.2d 123, 127 (1991); Adams v. Plaza Theatre, Inc., 186 Va. 403, 409-10, 43 S.E.2d 47, 51 (1947).  Therefore, the trial court's refusal to give the defendants' proffered instructions was not error.

IV.

In summary, for the reasons stated, we will reverse the judgment of the trial court and reinstate the verdict of the jury in favor of the plaintiff on Counts I, III, and VI. Because the trial court did not consider entry of an award in

18

accordance with the provisions of § 18.2-500, we will remand

the case for entry of a judgment consistent with this opinion.[2]

<u>Reversed and remanded.</u>

---

[2] Section 18.2-500 provides that a person injured in his business through violation of § 18.2-499 may recover "three-fold the damages by him sustained" along with costs and attorneys' fees.