Present: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and
Lemons, JJ., and Carrico,[1] S.J.

DONALD WILLIAMS

                                           OPINION BY
v.  Record No. 020392        JUSTICE LAWRENCE L. KOONTZ, JR.
                                        February 28, 2003
DOMINION TECHNOLOGY PARTNERS, L.L.C.

             FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                        Cleo E. Powell, Judge

     This appeal arises from a judgment in favor of an employer

against a former at-will employee on a motion for judgment

seeking damages for an alleged breach of a fiduciary duty,

tortious interference with a business relationship, and business

conspiracy in violation of Code §§ 18.2-499 and 18.2-500.

                             BACKGROUND

     Under well-settled principles of appellate procedure, we

"consider the facts, some of which are disputed, in the light

most favorable to the plaintiff, who is here armed with a jury

verdict confirmed by the trial judge."  Norfolk Southern Railway

Co. v. Trimiew, 253 Va. 22, 25, 480 S.E.2d 104, 107 (1997).

     Dominion Technology Partners, L.L.C. (Dominion), based in

Chesterfield County, is an employment firm specializing in

recruiting qualified computer consultants and placing them,

either directly or through third-party brokers, on a temporary

---

     [1] Chief Justice Carrico presided and participated in the
hearing and decision of this case prior to the effective date of
his retirement on January 31, 2003.

basis with various companies.  Sometime in late 1998 or early 1999, Dominion learned that Stihl, Inc. (Stihl), a power tool manufacturing firm, was seeking a computer consultant to oversee the installation of a new software package on computer systems at Stihl's facilities in Virginia Beach.

Dominion recruited Donald Williams as a possible candidate to fill the position at Stihl.  At that time, Dominion prepared two employment offers and presented them to Williams.  One offer provided that Williams would be a salaried employee of Dominion and receive compensation of $100,000 per year and various fringe benefits, regardless of whether Dominion was actually able to place Williams in a temporary position during the year.  This offer further provided that Williams would be required to "sign the standard confidentiality agreement" at a later date. Alternately, Dominion offered to employ Williams as an at-will employee, paying Williams $80 per hour.  As an at-will employee, Williams would receive no fringe benefits and would receive compensation only for work actually performed for a Dominion client.  Williams elected to work as an at-will employee.

Williams was referred to Stihl for a placement interview. Stihl found that Williams was qualified to provide the computer consulting services that it required.  On January 22, 1999,

Stihl entered into a contract with ACSYS Information Technology, Inc. (ACSYS), an employment brokerage company with its principal offices in the State of Georgia, to employ Williams for an initial period of three months. The contract provided that if Stihl chose to directly employ Williams at a later date, ACSYS would receive a "conversion fee." The contract made no reference to Williams' employment by Dominion.

On January 28, 1999, ACSYS entered into a contract with Dominion for Williams' services.[2] The contract provided that ACSYS would "act as a brokering agent for [Dominion] to provide Information Systems Services . . . to clients of ACSYS." The contract was terminable by either party upon thirty days written notice, and included a provision requiring Dominion not to solicit business from any client of ACSYS during the term of the contract or for one year thereafter. The contract did not include any terms prohibiting ACSYS from recruiting or directly employing current or former employees of Dominion.

Subsequently, Williams performed computer consulting services for Stihl under a work order from ACSYS to Dominion beginning in January 1999. Shortly after he began work at

---

[2] The dates of the contracts seem to be inconsistent. However, the parties do not dispute that these dates are not significant because from the beginning, "ACSYS had the position at STIHL. [It] did not have a person [to fill the position]."

Stihl, ACSYS required Williams to sign a "project assignment" letter that included provisions, similar to those in the contract between ACSYS and Dominion, that Williams could not directly solicit Stihl or any other ACSYS client for additional work during the term of his assignment or for one year afterwards.

According to Walt Yancey, information systems manager for Stihl's Virginia Beach facility, Williams was responsible for the installation of a new software package related to Stihl's computer word processing, production and materials planning, and customer shipment functions. The installation was to be completed by April 1999 at the end of Williams' initial three-month assignment at Stihl. The installation was completed on time, and Stihl decided to retain Williams in "a support and maintenance role" for an indeterminate period. Williams' assignment at Stihl was extended by agreement with ACSYS as reflected in a series of work orders from ACSYS to Dominion. The final work order, accepted by Dominion on January 14, 2000, provided that the duration of the assignment would be on "a monthly basis as dictated by client."

Under its contract with Stihl, ACSYS received $165 for each hour of work performed by Williams. Dominion billed ACSYS $115 for each hour of work performed by Williams, and, in turn, paid

4

Williams $80 per hour.[3]  At some point during his work at Stihl, a copy of a work order from ACSYS to Dominion was mistakenly sent to Williams.  As a result, Williams learned that Dominion received $115 for each hour that he worked at Stihl.

ACSYS learned that Stihl was considering a further software upgrade to its computer systems.  On February 17, 2000, Ryan Lenox, the "asset retention manager" for ACSYS,[4] contacted Williams in an effort to determine whether Stihl had decided to go ahead with the software upgrade.  Williams told Lenox that, although no firm decision had been made, Yancey had indicated that Stihl would probably delay making the upgrade until sometime in June 2000 when a new version of the software was expected to be released.  Williams indicated to Lenox that "this is just an idea floating around STIHL."

During their conversation, Williams told Lenox that there had been a change in the ownership and management of Dominion and that, because of personality conflicts with the new management, Williams wanted to terminate his employment with

---

[3] The work orders from ACSYS to Dominion also provided for an expense per diem, and Dominion billed ACSYS for Williams' travel, lodging, and meals.

[4] Lenox's duties as asset retention manager required him to contact clients and the employees placed by ACSYS to determine the status of their projects and to learn of any possible extensions or new business opportunities.

Dominion.  Williams indicated that he would prefer to continue working at Stihl under a direct agreement with ACSYS.  However, he also told Lenox that he would seek other employment if that agreement could not be reached.

Lenox was concerned initially that directly employing Williams might violate ACSYS's contract with Dominion and advised Williams that he would "look into the matter." Apparently after determining that the contract with Dominion did not bar ACSYS from recruiting Williams, Lenox called Williams later that same day.  He then inquired whether Williams was free to leave Dominion to work directly for ACSYS and, if so, what hourly rate of compensation Williams would want from ACSYS. Williams told Lenox about having learned that Dominion was paid $115 per hour for Williams' work at Stihl and stated that he would accept $100 per hour from ACSYS.  Williams also told Lenox that he was "99.9% certain that he did not sign anything with Dominion" which would prohibit him from leaving his employment with Dominion to work directly for ACSYS.

On February 21, 2000, Williams and Lenox had several telephone conversations concerning Williams' desire to terminate his employment with Dominion, and Lenox subsequently was contacted by Dominion the following day.  Lenox recorded the substance of these conversations in a memorandum dated February 22, 2000:

> Talked with Donald [Williams] yesterday several times. He has signed no paperwork with Dominion Technology. He wants to move ahead & come on board with us as a W2 at $100@hr pay rate. Discussed with [another ACSYS employee] & came up with following plan: Donald will contact Dominion and ask how much notice they have to give us—two weeks or longer (our contract with Dominion has a 30 day notice). Donald plans not to tell them that he [is] staying at Stihl via us. Got a call today from [Joseph] Delfino @ Dominion. He said he was calling to let me know that Scott Webster [was] no longer at Dominion . . . "we got rid of him he did not leave us." He then asked whether we [were] still active in SAP marketplace as he was going to be in Atlanta next month and would like to come by and see us (This was his story since he did not know where ACSYS IT was located until he asked me – he thought we were in Richmond, VA). He then asked how much longer Donald was going to be at Stihl. I told him it was a month to month setup based on Stihl. He wanted to know how often I talked with Stihl – every other month. How often I talked with Donald – about once a month. I called Donald after hanging up with Joe. Donald talked with [James] Delfino (Joe's son who really runs Dominion Technology) last night and asked him how much notice he had to give them to give us as he was thinking about leaving. I am sure that this is what triggered call from Joe. Jim Delfino is going to get back with Donald later today.

Williams told James Delfino that he wanted to terminate his employment with Dominion in order to pursue work opportunities closer to his home in the Richmond area. James Delfino advised Williams that he was required to give Dominion at least 30 days notice before terminating his employment. In a letter dated March 4, 2000, Williams formally tendered his resignation as an at-will employee of Dominion to be effective April 14, 2000. Williams stated in the letter that Dominion should advise ACSYS of his decision.

7

James Delfino thereafter made inquiries to ACSYS concerning the possibility of "backfilling" Williams' position at Stihl, that is, having Dominion supply another employee to take Williams' place. Although ACSYS did not expressly tell Dominion so, James Delfino concluded from the response to his inquiries "that there was no opportunity for us to fill the position." In May 2000, Dominion learned that Williams had continued working at Stihl as an ACSYS employee after April 14, 2000. Ultimately, Williams remained at Stihl as an ACSYS employee until June 1, 2001. During that time, ACSYS paid Williams $115 per hour, rather than the $100 per hour that had been previously discussed, and Stihl continued to pay $165 per hour to ACSYS for Williams' work at Stihl.

On July 11, 2000, Dominion filed a motion for judgment against Williams alleging breach of contract, tortious interference with business relationships and prospective business relationships, breach of fiduciary duty, and business conspiracy in violation of Code §§ 18.2-499 and 18.2-500. Although the allegations of the motion for judgment relevant to the business conspiracy count named ACSYS as a party to the alleged conspiracy, ACSYS was not named as a defendant in the suit. For each theory of liability, Dominion sought damages of "$150,000, an amount Dominion estimates it would have earned under its ACSYS contract with Williams, or another employee

8

performing the service Williams now provides to Stihl."
Dominion also sought punitive damages of $100,000 for breach of
fiduciary duty and business conspiracy.  Finally, Dominion
sought an award of treble damages for the business conspiracy
pursuant to Code § 18.2-500, and requested that it be awarded
attorneys' fees.

Williams filed a demurrer to the claim for breach of
contract and grounds of defense asserting general denials
regarding all counts of the motion for judgment.  In a letter
opinion dated September 13, 2000, the trial court opined that
there were insufficient allegations of a contract between
Williams and Dominion in the motion for judgment and that the
demurrer to the breach of contract claim would be sustained.
Although the trial court never entered an order memorializing
this ruling, the parties thereafter agreed that Williams was an
employee-at-will and that he was not bound by any express
confidentiality or non-compete agreement with Dominion.

A jury trial was held on August 22, 2001, at which evidence
in accord with the above-recited facts was received.  At the
conclusion of Dominion's case-in-chief and again at the
conclusion of the presentation of all evidence, Williams moved
to strike Dominion's evidence on the ground that it had not
proved the existence of a fiduciary duty owed by him as an at-
will employee to Dominion or that his actions had breached any

9

duty. Williams further asserted that he could not be guilty of a business conspiracy with ACSYS because he was effectively an agent of ACSYS, and an agent cannot conspire with a principal. The trial court denied the first motion to strike, but took the remaining motion to strike under advisement and submitted the case to the jury. The jury returned its verdict in favor of Dominion, awarding it $27,000 compensatory damages and $20,000 punitive damages for breach of fiduciary duty, $27,000 damages for tortious interference with business relationships, and $27,000 damages for participation in a business conspiracy in violation of Code §§ 18.2-499 and 18.2-500.

Williams filed a motion to set aside the jury's verdict. In a letter opinion dated October 26, 2001, the trial court addressed the argument made by Williams in moving to strike the business conspiracy claim. The trial court concluded that whether Williams was an agent of ACSYS during his employment by Dominion was a factual matter and that the jury had resolved the issue against Williams. The trial court further opined that Williams' breach of fiduciary duty constituted sufficient "lack of legal justification" to support finding a business conspiracy.

In a final order dated November 14, 2001, the trial court entered judgment on the jury's verdict, awarding treble damages for the business conspiracy under Code § 18.2-500, and

10

attorneys' fees and costs totaling $22,801.05.  In an order

dated April 23, 2002, we awarded Williams this appeal.

DISCUSSION

Although the judgment awarded to Dominion against Williams

in the trial court was founded upon three different theories of

liability:  breach of a fiduciary duty, interference with

business relationships, and statutory business conspiracy, the

essential facts asserted to support each theory are intricately

interrelated in this particular case.  The significance of that

interrelationship will become apparent hereafter as we consider

each of these theories of liability.

We have long recognized that under the common law an

employee, including an employee-at-will, owes a fiduciary duty

of loyalty to his employer during his employment.  See, e.g.,

Horne v. Holley, 167 Va. 234, 241, 188 S.E. 169, 172 (1936).

Subsumed within this general duty of loyalty is the more

specific duty that the employee not compete with his employer

during his employment.  Hilb, Rogal & Hamilton Co. of Richmond

v. DePew, 247 Va. 240, 249, 440 S.E.2d 918, 923 (1994).

Nonetheless, in the absence of a contract restriction regarding

this duty of loyalty, an employee has the right to make

arrangements during his employment to compete with his employer

after resigning his post.  The employee's right in such

circumstances is not absolute.  Rather, "[t]his right, based on

11

a policy of free competition, must be balanced with the importance of the integrity and fairness attaching to the relationship between employer and employee." Feddeman & Co. v. Langan Assoc., 260 Va. 35, 42, 530 S.E.2d 668, 672 (2000). Thus, "[u]nder certain circumstances, the exercise of the right may constitute a breach of fiduciary duty. . . . Whether specific conduct taken prior to resignation breaches a fiduciary duty requires a case by case analysis." Id.

In Glass v. Glass, 228 Va. 39, 51, 321 S.E.2d 69, 76-77 (1984), we recognized the existence of the tort of interference with a business relationship. We summarized the elements of a cause of action for this tort as follows: "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." Id. at 51-52, 321 S.E.2d at 77.

Code § 18.2-500 provides civil damages for violation of Code § 18.2-499, which, in pertinent part, imposes such liability against "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his . . . business . . . by any means whatever." In order to

12

sustain a claim for this statutory business conspiracy, the plaintiff must prove by clear and convincing evidence that the defendants acted with legal malice, that is, proof that the defendants acted intentionally, purposefully, and without lawful justification, and that such actions injured the plaintiff's business. See Feddeman & Co., 260 Va. at 44, 530 S.E.2d at 673-74.

Dominion concedes that because he was an at-will employee, Williams could have terminated his employment with Dominion at any time and without any requirement, in terms of a fiduciary duty, to show good cause for doing so. Moreover, Dominion also concedes that had Williams terminated his employment and then immediately offered his services to ACSYS, there would be no basis for asserting that this constituted a breach of a fiduciary duty to his former employer. Thus, the essence of Dominion's assertions against Williams for damages under each theory of liability, whether denominated as a "breach of a fiduciary duty," "intentional misconduct," or a conspiratorial act of "legal malice," is that Williams, after having learned that his services as a computer consultant were likely to be needed at Stihl for an extended period of time, and while still an employee of Dominion, arranged with ACSYS to become its employee effective upon his resignation from Dominion.

13

The dispositive question to be resolved regarding all three theories of liability is whether this conduct, which was undoubtedly proved by the evidence, was sufficient to constitute a breach of Williams' fiduciary duty of loyalty to Dominion. Whether such a duty exists is a question of law to be determined by the trial court. If the evidence is sufficient to establish a duty as a matter of law, only then will it become a matter for the jury to determine whether the duty has been breached.

In applying a case by case analysis to determine whether specific conduct taken by an employee breaches a fiduciary duty of loyalty, the courts must be mindful that the fact that particular conduct of an employee caused harm to his employer does not establish that the conduct breached any duty to the employer. This is so because the law will not provide relief to every "disgruntled player in the rough-and-tumble world comprising the competitive marketplace," especially where, through more prudent business practices, the harm complained of could easily have been avoided. ITT Hartford Group, Inc. v. Virginia Financial Assocs., Inc., 258 Va. 193, 204, 520 S.E.2d 355, 361 (1999).

We have recognized that certain conduct by an employee during the term of his employment will clearly constitute a breach of the duty of loyalty he owes to his employer. Principally, an employee must not have "misappropriated trade

14

secrets, misused confidential information, [or] solicited an employer's clients or other employees prior to termination of employment." Feddeman & Co., 260 Va. at 42, 530 S.E.2d at 672. While this list is by no means exhaustive, it is indicative of the types of conduct by an employee that the common law will not condone in an employment relationship.

Dominion does not contend that the information that Stihl was considering a further upgrade to its software was a "trade secret" or "confidential information" that was exclusive or proprietary to Dominion. To the contrary, James Delfino testified that Dominion subsequently obtained the same information from an independent source. In his testimony, Delfino agreed with the characterization of the information as "important," asserting that it would have led Dominion to make inquiries as to whether "we could help them with that."[5] In effect, Dominion considered the information a business opportunity or "lead" not unlike the information that caused them to seek out Williams as a potential employee in the first instance.

---

[5] Delfino further maintained that because Dominion had prior contacts with Stihl, it could have directly solicited Stihl without going through ACSYS. Although the issue is not before us, we note that under the terms of its contract with ACSYS, the prohibition on Dominion against soliciting additional work from ACSYS's clients contains no express exceptions.

15

In this context, Williams simply knew that there was a possibility, perhaps even a probability, that within four to six months Stihl would make a business decision that would require it to continue his services as a computer consultant or to acquire the services of someone equally qualified.  Williams had the right to make the necessary arrangements to resign from his employment with Dominion in such a way as to take advantage of a higher level of compensation if his services at Stihl were needed beyond the month-to-month arrangement then in place, so long as these arrangements were not disloyal or unfair to Dominion.

Williams tendered his resignation to Dominion in such a manner as to permit Dominion to comply with its contractual obligation to ACSYS.  Williams and ACSYS both took care to assure that there was no contractual bar to their contemplated actions.  As Williams and ACSYS discovered, Dominion had not sought a non-compete agreement from Williams or ACSYS, which would have prohibited their subsequent contractual arrangement.  In such circumstances, it cannot be said that Williams' conduct to safeguard his own interests was either disloyal or unfair to Dominion.  Rather, we are of opinion that Dominion's contracts provided it with nothing more than "a subjective belief or hope that the business relationship[s] would continue and merely a possibility that future economic benefit would accrue to it."

Commercial Business Systems, Inc. v. Halifax Corp., 253 Va. 292, 303, 484 S.E.2d 892, 898 (1997).

Moreover, Williams' conduct, certainly taken out of self-interest, did not rob his employer of any objective or tangible business opportunity or expectancy. To the contrary, by providing reasonable notice of his intent to resign his post and permitting Dominion to fulfil its obligation to ACSYS, Williams allowed Dominion to receive all the benefits for which it had bargained. Dominion's disappointment that its hopes did not bear the expected additional benefit it might have obtained under a different contractual agreement with ACSYS does not translate into a breach of any fiduciary duty Williams owed to Dominion.

CONCLUSION

For these reasons, we hold that the trial court erred in ruling as a matter of law that Dominion's evidence was sufficient to establish that Williams had a fiduciary duty to Dominion under the circumstances of this case and permitting the jury to determine whether Williams breached such a duty. Because the same conduct was alleged to constitute the proof of the "intentional misconduct" and "legal malice" elements of the two other theories of liability presented by Dominion, there was no basis for the jury finding for Dominion on those counts as

17

well.  Accordingly, we will reverse the judgment in favor of Dominion, and enter final judgment for Williams.

<u>Reversed and final judgment</u>.