## CIRCUIT COURT OF FAIRFAX COUNTY

Northern Virginia
Real Estate, Inc., et al.

v.

Karen Martins et al.

Case No. CL 2007-8717

BY JUDGE JONATHAN C. THACHER

April 22, 2008

This matter came before the Court on the Counter-Defendants' Demurrer to the Count I and Count II of the Counterclaim. After considering the arguments from counsel and the relevant legal authority, the Court sustains the Demurrer to Count I and Count II with prejudice.

*Background*

This action arose when the Plaintiffs filed an eleven-count Complaint against the Defendants, alleging numerous causes of action ranging from business conspiracy to defamation. The Defendants initially hired the Plaintiffs to list and sell the Defendant's mother's home. The Defendants subsequently filed a Counterclaim, alleging two causes of action both seeking declaratory relief.

The Counterclaim alleges that the Counter-Defendants breached their contractual obligations to the Counter-Plaintiffs by not communicating offers to purchase the property, misrepresenting facts concerning the status of offers, misrepresenting key provisions of offers which would affect the value of the

offer, and discouraging other offers. As a result of these breaches, the Counter-Plaintiffs terminated their contract with the Counter-Defendants and then filed a complaint with the Virginia Department of Professional and Occupational Regulation (DPOR). The Counter-Plaintiffs now seek a declaration that their prior acts of terminating their contract with Counter-Defendants and filing a complaint with the DPOR were justified.

The Counter-Defendants filed a demurrer to both causes of action in the Counterclaim and argued that a declaratory judgment action is not proper for either cause of action since the Counter-Plaintiffs are seeking to resolve a matured conflict between the parties. The Counter-Plaintiffs opposed the demurrer, arguing that a declaration of the parties' respective rights is proper to guide future legal actions.

*Analysis*

A demurrer tests only the sufficiency of factual allegations made in a pleading to determine whether the pleading states a cause of action. *Fun v. Virginia Military Inst.*, 245 Va. 249, 252, 427 S.E.2d 181, 183 (1993). When ruling on a demurrer, in contrast to ruling on a motion for summary judgment, a court is not permitted to decide the merits of a claim, but only may decide whether a plaintiff's factual allegations are sufficient to state a cause of action. *Barber v. VistaRMS, Inc.*, 272 Va. 319, 327, 634 S.E.2d 706, 711 (2006). A demurrer does not, however, admit the correctness of legal conclusions asserted in the complaint. *Taboada v. Daly Seven, Inc.*, 271 Va. 313, 317-18, 626 S.E.2d 428, 429 (2006).

The purpose of a declaratory judgment action is to afford the parties relief from uncertainty and insecurity pertaining to their legal rights involved in a controversy without requiring one of the parties to invade the rights of the other. *Liberty Mutual Ins. Co. v. Bishop*, 211 Va. 414, 418, 177 S.E.2d 519, 522 (1970). The declaratory judgment statute does not expand a party's rights but rather provides a method of declaring those rights before they mature. *Id.* at 421, 177 S.E.2d at 524. Essentially a declaratory judgment allows a party to obtain a declaration of her rights before an actual injury has occurred. *Williams v. Bank of Norfolk*, 203 Va. 657, 662, 125 S.E.2d 803, 807 (1962). However, when the rights and various duties have all matured, customary common law claims should be adopted. *Liberty Mutual Ins. Co.*, 211 Va. at 419, 177 S.E.2d at 522.

In *Bishop*, after two secondary insurance providers settled a wrongful death action on behalf of the insured, they filed a declaratory judgment action against the primary insurance company for failure to defend the case and

sought to recover money spent in defending the action. *Id.* at 416, 177 S.E.2d at 520-21. At issue was whether the primary insurer's policy excluded it from defending the insured. *Id.* The Supreme Court of Virginia ruled that a declaratory judgment was an improper claim. *Id.* at 419, 177 S.E.2d at 522. When the suit was filed, the two secondary insurance providers had already settled the underlying case and were simply trying to recover money spent in obtaining that settlement. Essentially all the rights and duties of each party had matured at the time the suit was filed. *Id.* Therefore, a declaratory judgment would not guide the parties from uncertainty but would rather resolve the underlying conflict. *Id.* at 421, 177 S.E.2d at 524.

Here, the Counterclaim seeks two declaratory remedies. First, Counter-Plaintiff Donna Gavin seeks a declaration that she was justified in terminating her contract with the Counter-Defendants. Second, both Counter-Plaintiffs seek a declaration that they were justified in filing their complaint with the DPOR discussing the factual situation with the Counter-Defendants. In essence, the Counter-Plaintiffs are not seeking declaration of their rights to guide their future behavior and relieve any uncertainty.

Rather, the Counterclaim seeks to address past actions taken by the Gavins leading up to this litigation and to determine whether these actions were appropriate. Such a determination is not properly pursued by bringing a declaratory judgment action. Like *Bishop,* uncertainty no longer exists. The Gavins have taken action, either rightfully or wrongfully, that have affected each party's respective legal rights. The Counter-Plaintiffs seek to resolve whether their prior actions were *justified*. They do not seek a declaration of their legal rights to avoid future litigation. As the Supreme Court of Virginia held in *Chick v. MacBain,* the purpose of the declaratory judgment statute is to prevent future litigation and "to prune, as far as is consonant with right and justice, the dead wood attached to the common law rule of injury before action." See *Chick v. MacBain,* 157 Va. 60, 66, 160 S.E. 214, 216 (131). The Counterclaim only seeks to resolve a matured conflict between the parties.

While the Counter-Plaintiffs argued that a declaration is necessary to guide the party's future conduct, the Counterclaim only seeks a declaration that the Counter-Plaintiff's past conduct was justified. The Counter-Plaintiffs have already terminated their contract with the Counter-Defendants and filed a complaint with the DPOR; they are no longer seeking a declaration that such action would be appropriate, if taken, but rather seek to resolve whether such conduct was legally justified. Such a remedy is better pursued by filing common law actions. The declaratory judgment action was intended to prevent future litigation not to resolve established conflicts between the parties. As such, the facts do not support a claim for declaratory relief.

*Conclusion*

After considering the relevant legal authority and each party's brief and oral arguments, the Court sustains the Demurrer with prejudice.

March 17, 2009

This matter came before the Court on Defendants' Motions for Sanctions. After considering the pleadings, the evidence, the oral and written arguments of counsel, and the relevant legal authority, the Court grants the motion.

*Background*

*The Parties*

Northern Virginia Real Estate, Inc. (NVRE) is a real estate broker operating in northern Virginia. Lauren Kivlighan is a real estate agent and the owner of NVRE. McEnearney Associates, Inc. (McEnearney) is also a real estate broker operating in northern Virginia, and Karen Martins is a real estate agent associated with McEnearney. Barbara and Pete Wheeler are homebuyers represented by Karen Martins. Donna Gavin and David Gavin are a married couple residing in Virginia. Bernadette Kennedy is Donna Gavin's mother and, for all practical purposes the owner of the property at issue. Donna Gavin at all times relevant held a power of attorney for Mrs. Kennedy. Osman Alnifaidy is an individual who offered to purchase the property.

*The Transaction*

In March 2007, Kivlighan and Donna Gavin reached an oral agreement for Kivlighan to represent Mrs. Kennedy in the sale of her house. Kivlighan suggested a target price of $729,900 and a commission of six percent. When the agreement was formed, Kivlighan already had a "pocket buyer" (Mr. Alnifaidy) for the property and so expected to earn the full six percent commission on the sale by representing both the seller and her already identified buyer. For their part, the Gavins appear to have expected Kivlighan to steer potential buyers in need of a mortgage to a relative, who worked as a loan officer in the then-burgeoning northern Virginia real estate finance industry.

The parties dispute whether or not Kivlighan was instructed to list the property, as is the usual practice for realtors with a listing agreement, or whether Kivlighan was instructed to not list the property until it was vacated and prepared for sale. A written listing agreement was eventually signed by Donna Gavin, under the power of attorney, presumably on behalf of Mrs. Kennedy, on April 27, 2007. The only significant difference between the April 27 written agreement and the March oral agreement is that Donna Gavin reduced the realtor's commission to five percent.

Meanwhile Karen Martins noticed signs of an impending sale and brought her clients (the Wheelers) to view the property on April 26, 2007. While there, they spoke to a family member or workman at the home and were referred to David Gavin. From David Gavin, Martins learned that Kivlighan represented the property owners. From Kivlighan, she learned that an offer had already been made for the seller's full asking price and at a reduced commission. Because the Wheelers were not interested in getting into a "bidding war," they instructed Martins not to submit an offer on their behalf.

Although Kivlighan's pocket buyer made an offer of $730,000, and eventually $750,000, the offers came with additional terms or conditions that the Gavins found unacceptable. Major sticking points included a home inspection contingency and a "seller subsidy" of four percent of the sales price. Here, the "seller subsidy" is indistinguishable from a reduction in the sales price, except that Kivlighan would apparently collect a commission on the contract price of $750,000 rather than on the "subsidized" price of $720,000 her pocket buyer would have actually paid. Ultimately the Gavins accepted neither of the offers Kivlighan brought them. Meanwhile, David Gavin believed from his discussion with Karen Martins that there was at least one potential buyer Kivlighan had not reported to them. In addition, the Gavins were upset by the fact that Kivlighan faxed them a contract offer from her pocket buyer with a cover sheet announcing "as is" only to discover the home inspection contingency buried inside. These two omissions, or possibly just misunderstandings, damaged Kivlighan's working relationship with the Gavins.

With mutual hostility and mistrust running rampant, after consulting with her attorney, Donna Gavin discharged Kivlighan. The precise timing is disputed. It is not disputed that, on May 8, 2007, Donna Gavin sent Kivlighan written notice of termination. Kivlighan believed the Gavins were trying to fire her and then make their own deal with Martins' clients to avoid having to pay her commission; the Gavins believed Kivlighan was trying drive off competition to give her pocket buyer a clear field (and ensure she would not have to split the commission with another agent). Working through Martins,

they then negotiated a sale to Martins' clients, the Wheelers. The contract price was less than the facial amount offered by Kivlighan's pocket buyer, but contained no "seller subsidy." Although it contained a home inspection clause, the Gavins were less concerned by the clause in the Wheeler's contract because, unlike Kivlighan's pocket buyer, the Wheelers had actually viewed the property in person, most importantly the interior. One half of the sales commission (the "buyer's commission") was paid to Martins. No seller's commission was paid. When Kivlighan learned that the property had been sold to the Wheelers, through Martins, grievances and counter-grievances flew to the Northern Virginia Association of Realtors and the Virginia Department of Professional and Occupational Regulation. All grievances filed against both agents with both bodies were ultimately dismissed without adverse action against either agent.

## Pleadings

On July 20, 2007, Kivlighan filed suit against the Gavins, Martins, and McEnearney. Count I of the complaint alleged conspiracy to harm in business, Count II interference with contract, Count III interference with contract expectancy, and Count IV defamation. Count I sought damages of $100,000, trebled to $300,000, Counts II and III each sought actual damages of $100,000 and punitive damages of $500,000, and Count IV sought compensatory damages of $1 million, and punitive damages of $500,000. Four numbered paragraphs supporting Count IV, paragraphs 89, 92, 95, and 98, state that they are "likely to have evidentiary support after a reasonable opportunity for discovery."

After demurrers by all defendants, Kivlighan filed an amended complaint on October 5, 2007. Count I alleged conspiracy to harm in business against the Gavins and Martins, Count II conspiracy to harm in business against McEnearney under a theory of respondeat superior, Count III interference with contract expectancy against the Gavins and Martins, Count IV interference with contract expectancy against McEnearney under a theory of respondeat superior, Counts V-VII defamation against Martins and McEnearney, Counts VIII-X defamation against the Gavins, and Count XI defamation against David Gavin alone. Counts I and II seek $168,000 in actual damages, trebled to $504,000, plus punitive damages of $350,000. Counts III and IV seek actual damages of $168,000 plus punitive damages of $350,000, and Counts V-XI each seek $1 million in compensatory damages, plus $350,000 in punitive damages. The alleged factual basis for the defamation claims includes statements submitted to the Northern

Virginia Association of Realtors and the Virginia Department of Professional and Occupational Regulation in connection with their consideration of the professional complaints filed against Kivlighan and Martins.

Also on October 5, 2007, in response to a consent order, Kivlighan filed a bill of particulars outlining the basis for her damage claims. The bill of particulars reveals that Kivlighan essentially sought a 5% commission on the $750,000 offer from her pocket buyer ($37,500), plus an additional 6% commission on a $2,175,000 sale ($130,500) of the same property at some future date after the existing structure had been demolished and a new house built on the site. No basis was indicated then or ever for the $1.5 million in claimed damages arising from the various defamation counts.

Another round of demurrers was cut short by a December 14, 2007, order granting Kivlighan leave to again amend the complaint to include new facts gleaned through discovery. The Second Amended Complaint, filed December 21, 2007, alleges conspiracy to harm in business against the Gavins and Martins (Count I), conspiracy to harm in business against McEnearney under a theory of respondeat superior (Count II), interference with contract expectancy against the Gavins and Martins (Count III), interference with contract expectancy against McEnearney under a theory of respondeat superior (Count IV), dropped the three counts of defamation against Martins and McEnearney, alleged defamation against the Gavins (Counts VIII-X), and defamation against David Gavin alone (Count XI). Counts I and II seek $168,000 in actual damages, trebled to $504,000, plus punitive damages of $350,000. Counts III and IV seek actual damages of $168,000 plus punitive damages of $350,000, and Counts VIII-XI each seek $1 million in compensatory damages, plus $350,000 in punitive damages.

### Discovery Sanctions and Trial

A final round of demurrers ended with dismissal of the Gavins' counterclaims and dismissal of Counts VII-XI (the defamation counts) by order of December 21, 2007. The matter proceeded to trial on April 28-30, 2008, with only the Plaintiffs' claims for conspiracy to harm in business and interference with a contract expectancy remaining.

Just before trial, the Court, on motion of the Defendants, and exercising its authority under Rule 4:12, imposed discovery sanctions on the Plaintiffs for failing to respond to Defendants' properly propounded requests for admission. The Court's sanction deemed the Plaintiffs to have admitted each of the requests for admission they failed to answer. Most notable of these admissions

is: "Neither Plaintiff ever had a contract with the owner of the Subject Property, nor did either Plaintiff have a reasonable contractual or business expectancy which could support a claim of tortious interference."

Despite this rather damaging admission, Plaintiffs insisted on proceeding with a three day jury trial. After the close of Plaintiffs' evidence on the second day, Defendants moved to strike the evidence. While the motion was pending, Plaintiffs took a voluntary nonsuit, as is their right. These motions for sanctions followed. Defendants McEnearney and Martins seek $97,450.52 in costs and attorney's fees, and Defendants Donna and David Gavin seeking $179,048.70 in costs and attorney's fees, for a total of $276,499.22.

## The Arguments

Defendants argue that Kivlighan never had a valid claim for any commission on the sale of the property,[1] and that any allegedly defamatory statements were either not defamatory, or were privileged as a matter of law. Even if Kivlighan did have a valid claim for a commission on the property, that claim could have been no more than the 5% commission provided by the contract, or $37,500. They argue that there never was any evidence of a conspiracy that would justify treble damages and that the asserted claim to a 6% commission on a resale of the property for $2,175,000 at some future date was speculative as a matter of law and, at any rate, completely unsupported by any evidence.

Defendants point to Kivlighan's wildly exaggerated damage claims and the fact that she insisted on a three day jury trial even after the imposition of what can only be described as devastating discovery sanctions as evidence of an improper purpose behind the litigation. Even if there is some colorable factual basis for a valid claim against them, the claim is limited to a $37,500 claim for breach of contract, and the specious damage claims dramatically increased the cost of the litigation. Either way they believe sanctions are appropriate.

---

[1] Defendants expend much ink pressing their argument that Kivlighan never had a valid listing agreement because the property had been conveyed to a trust, of which Donna Gavin was only one of the trustees, and so she lacked authority to enter into the agreement. The Court finds little merit in this argument. Gavin's signature on the listing agreement "Donna Gavin, power of attorney," appears to be indistinguishable from her signature on the instruments that ultimately conveyed the property to the Wheelers.

Kivlighan's brief largely restates the allegations made in the complaint, appends twenty-two exhibits that purport to provide the factual basis for the claims, and cites a host of cases that, at best, stand for the proposition that the claims advanced in the pleadings are valid causes of action in Virginia. As with the pleadings themselves, many of the critical assertions are conclusory allegations, lacking factual or evidentiary support in the appended exhibits or anywhere else in the record.

## Analysis

Actual damages are a required and essential element of every claim Kivlighan advanced. Engaging in a brief thought experiment, the Court wonders what would have happened if the defendants never existed, and the transaction occurred in a vacuum containing only Kivlighan, Mrs. Kennedy, and Kivlighan's pocket buyer, entirely free from any malignant influence by any of the defendants or anyone else. The answer is that Defendants are correct. Kivlighan would have realized at most $37,500 from any contractual interest she acquired from the listing agreement.

In truth, her valid expectancy is probably limited to two-fifths of that amount, because after Donna Gavin's reduction, the contract provided for a seller's commission of only two percent. Nevertheless, assuming that her pocket buyer's offer was accepted and that she was paid both the buyer's and seller's agent commissions on the "unsubsidized" contract price of the highest offer her buyer ever made, she would have been entitled to $37,500 on the contract.

## The "Second Commission"

The claims Kivlighan advanced for the "second commission" on a sale of the same property at (1) some unknown date an indefinite number of years in the future, by (2) a seller whose offer to purchase the property was twice rejected, to (3) a not even speculatively identified purchaser for (4) precisely $2.175 million dollars, after (5) a contractor, whom the seller who did not yet own the home had not entered a contract with, would have torn down the existing structure and erected a mansion based on (6) unknown and unsolicited plans from an unidentified architect, are, to say it as kindly as possible, not "well grounded in fact and . . . warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." The best the Court can say about the evidence supporting these "damages" is that no party has proven that it could not have happened. Kivlighan never offered anything that that could lead the Court to reasonably conclude that she ever had a factual basis for this claim.

Kivlighan's own deposition testimony, exhibit eleven to the Gavins' Motion for Sanctions, illuminates the lack of factual basis for the claim. An excerpt follows.

Q: So this house that Mr. Alnifaidy was going to build, how many bedrooms would it have?

A: We didn't get that far.

Q: Does that mean that. . . .

A: We didn't discuss that.

Q: So you don't know?

A: I can't say for sure what house he was going to build there. No. . . .

Q: Did that talk include number of bedrooms and number of bathrooms, anything like that?

A: I don't recall.
Q: What about number of levels of the house?

A: I don't recall.

Q: What about whether there was to be a basement?

A: There would have to be a basement in a $2 million house.

Q: Okay, was there any discussion of having a garage?

A: There would have to be a garage on a $2 million home. . . .

Q: Let me put it this way, at trial in this case, if you win, the jury is supposed to put a figure on the dollars that you get.

A: Uh-huh.

Q: One of the things that they have to put figures on is you were entitled to 6% of a house that would have been sold that was worth $2,175,000, for a commission of $130,500.

A: I understand that.

Q: How are you going to prove that?

A: Because the *builder* will come up with those numbers definitively and state under oath that I — 99 percent sure — would have had that listing —

Q: Brian Kearney [the builder]?

A: — had this happened.

Q: Brian Kearney is going to say that happened?

A: Sure.

Q: Okay.

A: *He lost the construction of a house. I'm sure he's not happy.*

(emphasis added).

Although Kivlighan lacked any factual basis to advance the theory that she was entitled to a "second commission," perhaps her counsel had obtained such a basis through reasonable investigation? An excerpt from Mr. Alnifaidy's deposition (exhibit 14 to the Gavins' Motion for Sanctions) follows.

Q: I take it you told Lauren Kivlighan that your plan was to maybe rent it [the property at issue] for a while and then —

A: Yes.

Q: — tear it down and rebuild.

A: Uh-huh.
Q: And she knew that all along, is that right?

A: Yes. . . .

Q: Okay. Did you ever tell her a rough round figure, "We'll sell it for $2 million," or anything like that?

A: No. No. We were not at a point to discuss these things because we didn't have the property in the first place.

Q: Did you ever tell her that you would let her sell the property when you resold it?

A: No.

Q: Did you ever enter into a written agreement with her of any kind?

A: No.

Q: Was she ever your real estate agent?

A: No.

Q: On any property anywhere, was Lauren Kivlighan ever your real estate agent?

A: The answer is no.

Q: Did you ever promise Lauren Kivlighan that she could be your agent?

A: No. I couldn't promise her anything unless I get something from the start, you know; and it didn't go through, so —

Q: Right?

A: Yeah.

Q: Did Lauren Kivlighan ever ask you to let her be your agent?

A: No.

*Defamation*

Likewise for the $1.35 million in damages claimed for each of the defamation counts, after an extensive review of the transcripts, pleadings, and briefs filed in this case, the Court can discern no evidence that any action by the defendants conceivably or even allegedly cost Kivlighan anything other than the commission on the sale of Mrs. Kennedy's home. The pleadings make occasional vague references to some sort of generalized damage to her reputation, but these vague allegations are entirely unsupported by even factual allegations, let alone evidence. The Court is completely unable to find any factual basis for the $1.35 million figure.

*Conspiracy*

Although Defendants are correct that Plaintiffs' pleadings never clarified whether the business conspiracy claims were based on a common law right of action or the statutory cause authorized by § 18.2-499, in their memorandum opposing this motion, Plaintiffs take the position that the action is for statutory conspiracy. Statutory conspiracy requires "two or more persons who combine, associate, agree, mutually undertake, or concert together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, business, or profession. . . .' Virginia Code § 18.2-499. Malice must be proven by clear and convincing evidence. *Williams v. Dominion Technology Partners*, 265 Va. 280, 290, 576 S.E.2d 752 (2003).

There is simply no factual basis pleaded to support a finding of malice. Plaintiffs' entire factual basis for pleading conspiracy appears to be the fact that David Gavin and Karen Martins spoke to each other on the telephone, that David Gavin "exhibited a hostile and mean spirited manner," and that Lauren Kivlighan was discharged. Kivlighan does make vague references to a breach of professional standards, or etiquette, or something, and incredibly, to a breach of fiduciary duty. Nonetheless, the Court has been unable to find any facts or any law in the pleadings, the transcripts, or anywhere else to support the idea that Martins or Gavin ever owed any fiduciary duty to either of the plaintiffs, let alone breached it.

Nor have any facts ever been advanced that support the allegation Gavin and Martins formed any agreement during those telephone calls. Both Gavin and Martins denied any agreement to cut Kivlighan out of the deal, and Gavin testified that the calls were prompted by the fact that Kivlighan only

presented them with an offer from one buyer, when his earlier contact with Martins led him to believe that there was at least one more. Whatever circumstantial inferences Kivlighan would have the Court draw from the fact that Gavin and Martins spoke on the telephone, they could not rise to the level of clear and convincing proof. No court could responsibly permit such a claim to go to the jury without evidence, and no attorney could responsibly plead such a claim without facts to support it.

*Sanctions*

The statute is clear:

> The signature of an attorney or party constitutes a certificate by him that . . . to the best of his knowledge, information and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and . . . it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is signed or made in violation of this rule, the court . . . shall impose . . . an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper or making of the motion, including a reasonable attorney's fee.

Virginia Code § 8.01-271.1.

Litigants may not make baseless allegations in a pleading and hope to "have support after discovery." *Ford Motor Co. v. Benitez*, 273 Va. 242, 639 S.E.2d 203 (2007). Litigants are required to plead only those claims that have factual support. *Id.* at 252. If facts emerge in discovery to support additional claims, the proper course of action is to seek leave to amend. *Id.* Denial of leave to amend under such circumstances is an abuse of discretion by the trial court. *Id.* Arguments that rely on speculation are inherently not well grounded in fact. *Williams & Connolly v. PETA*, 273 Va. 498, 512, 643 S.E.2d 136 (2007). "Distorted representations in a pleading never serve a proper purpose and inherently render that pleading as one "interposed for [an] improper purpose," within the meaning of clause (iii) of the second

paragraph of Code § 8.01-271.1." *Id.* "[T]he manifest purpose of the statute is to hold attorneys, who are officers of the court, responsible for specified failures involving the integrity of the documents that they have signed. *Id.*

The Court has considered and rejects Plaintiffs' arguments that (1) the claims must not have been baseless because they survived demurrers, and (2) Defendants recognized the claims had merit or they would have had them dismissed on summary judgment. Whether a claim survives demurrer decides nothing because a party may make allegations that lack any factual basis. Here, an excellent example is Plaintiff's claim to a second commission. Such a claim did survive demurrer because of the deferential pleading standard, but it still violates the statute because it was not and is not well grounded in either fact or law. Additionally, Plaintiffs' apparently have forgotten that many of their claims were dismissed on demurrer, and with prejudice. The second argument fails because it misstates the legal issue. The question is not the skill or judgment of Defendants' counsel, the question is whether Plaintiff and her counsel complied with their statutory obligation to ensure the "integrity of the documents that they have signed."

The danger that a decision to sanction a party in one action could intimidate future parties and prevent them from asserting their valid rights is not one the Court takes lightly. One of the foundational functions of civilized government is to provide a forum where parties may peacefully resolve their disputes. The Court feels a particular obligation to avoid the "wisdom of hindsight" and objectively evaluate the actions of the parties taking into account only the information available to them at that time. Having given this matter thorough consideration, the Court is of the opinion that sanctions are warranted.

At a minimum, the filing of the initial complaint violated the statute by asserting in four numbered paragraphs that the allegations therein were likely to have support "after reasonable opportunity for discovery." As this Court understands the Virginia Supreme Court's decision in *Benitez*, such a pleading is a per se violation of § 8.01-271.1. Although the amended complaint contained no such candid admission that its allegations were unsupported by fact, Plaintiffs lack any factual basis for their $135,000 claim to the "second commission" and lack any basis for the $1.35 million defamation claims. Plaintiffs further lack a factual basis for a conspiracy claim.

The only claim Kivlighan ever advanced that was reasonably well grounded in fact is a $37,500 contract claim. Instead of limiting the action to that claim, Kivlighan and her counsel chose to advance at least three wildly speculative claims that lacked any basis in fact. These three claims dramatically increased the cost and duration of the litigation. Counsel's

decision to pursue a three day jury trial in the face of devastating discovery sanctions, including the admission that no contract existed between the parties, further increased the cost to the defendants, without any possible chance of success.

Standing alone, the Court might conclude that any of these claims were merely a mistake or an oversight by counsel and might warrant only a mild sanction. However, the combination of so many frivolous claims, supported by such wild speculation, so virulently prosecuted even after any legitimate prospect of success had vanished, convinces the Court that the claims were not an oversight or mistake. The Court is of the firm conviction that they were filed out of a vindictive and malevolent desire to injure and intimidate a business competitor. Accordingly, Defendants' motions for sanctions are granted.

Although Defendants' are entitled to sanctions, on this record, the Court is unable to determine the appropriate size of the sanction. Counsel shall set the matter for a hearing to establish whether Defendants' claimed expenses are reasonable and whether they are related to Plaintiffs' violations of the statute.