Env't Holdings Grp., LLC v. Finch, 2022 NCBC 25.

STATE OF NORTH CAROLINA

WAKE COUNTY

ENVIRONMENTAL HOLDINGS
GROUP, LLC,

                Plaintiff,

v.

SCOTT FINCH,

                Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 14019

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO DISMISS**

THIS MATTER comes before the Court on Defendant Scott Finch's Motion to Dismiss. ("Motion to Dismiss" or "Motion," ECF No. 13.)

THE COURT, having considered the Motion, the briefs of the parties, the arguments of counsel, and all applicable matters of record, CONCLUDES that the Motion should be GRANTED, in part, and DENIED, in part, for the reasons set forth below.

> *Fox Rothschild LLP, by Jeffrey R. Whitley and George J. Oliver, for Plaintiff Environmental Holdings Group, LLC.*
>
> *Hamilton Stephens Steele + Martin, PLLC, by Mark R. Kutny, for Defendant Scott Finch.*

Davis, Judge.

## INTRODUCTION

1.    In this action, an environmental services company doing business in multiple states, but principally located in North Carolina, has brought suit against a former employee, a Virginia resident, alleging an array of tortious conduct by the former employee relating to his work for the company in Virginia and his subsequent

departure from the company to work for a direct competitor. The present motion requires the Court to (1) apply choice of law rules to determine whether the substantive laws of North Carolina or Virginia govern the plaintiff's claims; and (2) determine whether the plaintiff has stated valid claims for relief under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure based on the substantive laws of that state.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) and instead recites pertinent facts contained in the Complaint ("Complaint," ECF No. 3) that are relevant to the Court's determination of the Motion.

3. Plaintiff Environmental Holdings Group, LLC ("Plaintiff" or "Alloy") is a "specialty environmental services company, providing niche services such as the abatement of hazardous materials, demolition, and environmental engineering to protect people from the adverse effects of pollution and improve the environmental quality of communities." (*Id.* at ¶ 6.) Alloy is a North Carolina limited liability company with its principal office in Morrisville, North Carolina and is registered to do business in North Carolina. (*Id.* at ¶ 1.) Alloy also does business and maintains offices "throughout the United States[.]" (*Id.* at ¶ 6.)

4. Alloy operates largely as a subcontractor by submitting competitive bids to contractors for specific contracts. (*Id.* at ¶ 7.) Alloy alleges that it has "at significant expense, developed substantial confidential information and trade secrets

over the years that provide it with a competitive advantage in this bidding process." (*Id*. at ¶ 8.) These purported trade secrets include: "client lists and information, client data and preferences, price points for bids, pricing strategies, supplier information, operating information [ ] including profits and expenses, business plans, strategic analysis, processes, and procedures." (*Id*.)

5. Alloy further alleges that its trade secrets are not generally available to the public and that it utilizes various measures designed to safeguard the secrecy of these trade secrets. (*Id*. at ¶¶ 9–10.) Such measures include "explicit policies requiring employees to maintain the secrecy of [Alloy's] confidential trade secret information"; requiring "all employees to sign an acknowledgment and receipt of the Employee Handbook containing these policies"; and "limiting employee access based on their position and job duties, password-protecting electronically-stored information, conducting exit interviews for departing employees, and requiring the immediate return of company property on an employee's last day of work." (*Id*. at ¶ 10.)

6. Defendant Scott Finch ("Defendant" or "Finch") was employed by Alloy as a Senior Project Manager for Alloy's projects in Richmond, Virginia from 10 December 2019 through 9 July 2021. (*Id*. at ¶¶ 11, 27.) During his employment with Alloy, Finch—a resident of Virginia—worked out of his "home office" while reporting to the Branch Manager of the Raleigh, North Carolina office, from which all of his work for Alloy was "facilitated." (*Id*. at ¶¶ 2–3, 11.) More specifically, Finch was supervised by an employee of the Raleigh office—Jim Smith—and Finch "directed

weekly or daily communications to Raleigh as a result of his employment duties." (*Id.* at ¶¶ 3, 24.)

7.  Alloy alleges that "Finch had substantial control and authority over the entire operation of [Alloy's] Richmond . . . projects, managing another project manager/estimator and overseeing all field personnel in Richmond[.]" (*Id.* at ¶ 12.) Notably, Finch was responsible for making bids on behalf of Alloy with regard to a project in Richmond known as the "Mutual Building Project" in early April 2021. Finch's bids were submitted to the general contractor of the project, L.F. Jennings. (*Id.* at ¶ 19.)

8.  Alloy's internal process associated with submitting a bid on a project is for its employees to put bid-related information in Alloy's secure on-line third-party cloud software filing system—referred to as "Box." (*Id.* at ¶¶ 20–21.) "Box" allows for the storing of bid information in a "shared location so that other Alloy team members can assess the status of [a] bid, provide input, and ensure a collaborative process that will result in the most competitive bid." (*Id.*)

9.  Contrary to the above-referenced practice, Finch failed to upload any information into "Box" regarding the Mutual Building Project until his last day of employment with Alloy on 9 July 2021. (*Id.* at ¶¶ 21, 27.) Instead, after the original bid of $1,789,098 (which had been reviewed by Alloy's Raleigh Branch Manager) was submitted, Finch subsequently submitted three revised bids for the Mutual Building Project between 10 June 2021 and 25 June 2021—increasing the original bid price by $140,215. (*Id.* at ¶¶ 24–25.) Finch did not obtain approval from, or even inform, his

supervisor or the Raleigh Branch Manager about the revised bid proposals or put information about them into "Box." (*Id.*)

10. During this same time period and without the knowledge of Alloy, Finch was also engaged in negotiations for employment with a direct competitor of Alloy, Trifecta Services Company ("Trifecta").[1] (*Id.* at ¶¶ 14, 22–23.) Trifecta made an offer of employment to Finch on 2 July 2021, and Finch subsequently gave notice of his resignation from Alloy three days later—designating 9 July 2021 as his last day of employment. (*Id.* at ¶¶ 26–27.) On 6 July 2021, Finch's supervisor asked Finch directly if he was leaving to join Trifecta. Finch responded "no" despite having already accepted the offer from Trifecta. (*Id.* at ¶ 28.)

11. On Finch's last day of employment with Alloy, Alloy received notification from L.F. Jennings that Trifecta had been awarded the Mutual Building Project. It was only then that Finch finally uploaded the revised bids he had made on behalf of Alloy into "Box." (*Id.* at ¶ 29.) Upon finally learning that Finch had revised Alloy's bid amounts without his knowledge, Smith cut approximately $140,000 from Finch's last submitted bid on the project and then submitted the new reduced bid to L.F. Jennings. (*Id.* at ¶ 30–31.) Smith then met with L.F. Jennings management officials who informed him that the new revised bid would have been less than Trifecta's bid,

---

[1] Although Trifecta is not a named party in this lawsuit, Alloy alleges that "[i]n the fall of 2020, Trifecta began a concerted effort to raid key Alloy personnel in an effort to hinder Alloy's ability to compete for customers and projects" and that this effort "has allowed [Trifecta] to successfully obtain projects that Alloy would otherwise could [sic] have been [sic] obtained." (ECF No. 3, at ¶¶ 15, 18.)

but that it was too late because L.F. Jennings had already awarded the project to Trifecta. (*Id.*)

12. Finch is currently managing the Mutual Building Project for Trifecta. (*Id.* at ¶ 32.) Within a short period of time after Finch's final day of employment with Alloy (and possibly earlier), Finch began contacting various supervisors of Alloy and soliciting them to terminate their employment with Alloy and come to work for Trifecta. (*Id.* at ¶ 33.)

13. On 15 October 2021, Alloy filed its Complaint in this matter, asserting four claims for relief against Finch: (1) misappropriation of trade secrets pursuant to N.C.G.S. § 66-152 et seq.; (2) unfair and deceptive trade practices ("UDTP") pursuant to Chapter 75 of the North Carolina General Statutes; (3) breach of fiduciary duty; and (4) tortious interference with prospective economic relations. (*Id.* at ¶¶ 34–61.)

14. This matter was designated a mandatory complex business case on 8 December 2021. (ECF Nos. 1–2.)

15. On 19 January 2022, Defendant filed a Motion to Dismiss pursuant to Rule 12(b)(6). (ECF No. 13.)

16. This matter came before the Court for a hearing on 20 April 2022. The Motion is now ripe for decision.

**LEGAL STANDARD**

17. "A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint by presenting the question whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can

be granted under some recognized legal theory." *Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus., Inc.*, 336 N.C. 438, 442 (1994) (cleaned up).

18. In ruling on a motion to dismiss under Rule 12(b)(6), the Court may only consider the pleading and "any exhibits attached to the [pleading,]" *Krawiec v. Manly*, 370 N.C. 602, 606 (2018), and must view the allegations in the complaint "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017) (quoting *Kirby v. N.C. Dep't of Transp.*, 368 N.C. 847, 852 (2016)).

19. "It is well-established that dismissal pursuant to Rule 12(b)(6) is proper when (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (cleaned up).

## ANALYSIS

20. Defendant's Motion directly raises choice of law issues—that is, whether the substantive laws of North Carolina or Virginia apply to Plaintiff's claims. Specifically, Defendant argues that Plaintiff's misappropriation of trade secrets and UDTP claims—both of which have been asserted by Plaintiff pursuant to specific North Carolina statutes—should be dismissed because Virginia law applies to these claims. (ECF No. 13, at ¶¶ 1–2.) In addressing Defendant's arguments, the Court deems it appropriate to determine which state's substantive laws applies to all four of Plaintiff's claims.

21.     As stated by our Supreme Court,

> [North Carolina's] traditional conflict of laws rule is that matters affecting the substantial rights of the parties are determined by *lex loci*, the law of the situs of the claim, and remedial or procedural rights are determined by *lex fori*, the law of the forum. For actions sounding in tort, the state where the injury occurred is considered the situs of the claim. Thus, under North Carolina law, when the injury giving rise to a negligence or strict liability claim occurs in another state, the law of that state governs resolution of the substantive issues in the controversy.

*Boudreau v. Baughman*, 322 N.C. 331, 335 (1988) (italics added). Our courts have "consistently adhered to the *lex loci* rule in tort actions." *Id.* (italics added).

22.     However, with regard to claims not grounded in tort law, our courts have on occasion used the "most significant relationship" test. *See*, *e.g.*, *id.* at 336 (stating that actions for breach of implied warranty are "now governed by the Uniform Commercial Code" and are "determined by the most significant relationship test").

23.     "According to the *lex loci* test, the substantive law of the state where the injury or harm was sustained or suffered, which is, ordinarily, the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place, applies." *SciGrip, Inc. v. Osae*, 373 N.C. 409, 420 (2020) (cleaned up). On the other hand, the most significant relationship test "provides for the use of the substantive law of the state with the most significant relationship to the claim in question," determined by an evaluation of "(a) the place where the injury occurred; (b) the place where the conduct giving rise to the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

(d) the place where the relationship, if any, between the parties is centered." *Id.* (cleaned up); *see* Restatement (Second) of Conflict of Laws § 145 (Am. L. Inst. 1971).

24.     With these principles in mind, the Court proceeds to determine whether North Carolina or Virginia law applies to each of the claims asserted by Plaintiff in the Complaint.[2]

### i.     Misappropriation of Trade Secrets

25.     Plaintiff's first cause of action is brought under the North Carolina Trade Secrets Protection Act ("NCTSPA")—N.C.G.S. § 66-152 et seq. (ECF No. 3, at ¶¶ 34–43.) Defendant argues that this claim should be dismissed because Virginia law applies, and therefore the NCTSPA "does not provide a source of liability." (ECF No. 14, at p. 4.)

26.     Our Supreme Court has recently provided guidance as to the appropriate choice of law analysis for misappropriation of trade secrets claims. *See SciGrip*, 373 N.C. at 419–22. In *SciGrip*, our Supreme Court was tasked with reviewing a decision in which this Court applied the *lex loci* test—rather than the most significant relationship test—to a misappropriation of trade secrets claim brought under the NCTSPA. *Id*. at 419. At the summary judgment stage, this Court "deemed the choice of law issue dispositive on the grounds that since 'the undisputed evidence demonstrates the alleged misappropriation occurred outside the state of North Carolina,' [plaintiff] cannot bring a claim under the [NCTSPA]." *Id*. at 419 n.3.

---

[2] Although Plaintiff suggests that discovery is necessary before this Court can properly rule on the choice of law issues, the Court is satisfied that the allegations in the Complaint are sufficient for the Court to do so at the present time.

27.     On appeal to the Supreme Court, the plaintiff argued that this Court instead should have applied the most significant relationship test.  *Id.*  The Supreme Court rejected this argument, stating that its "jurisprudence favors the use of the *lex loci* test in cases involving tort or tort-like claims" and holding that "the weight of [the] Court's decisions and those of federal courts predicting how [the Supreme] Court would address misappropriation of trade secrets claims tends to support the application of the *lex loci* test, rather than the most significant relationship test, in the misappropriation of trade secrets context."  *Id.* at 421.

28.     In light of *SciGrip*, this Court concludes that the *lex loci* test is applicable to Plaintiff's misappropriation of trade secrets claim.  In applying this test, the Court deems it appropriate to focus on "where the last event necessary to make the actor liable or the last event required to constitute the tort t[ook] place[.]"  *Id.* at 420.  Alloy alleges in the Complaint that Finch is a resident of Virginia; Finch served as Alloy's Senior Project Manager on Alloy's Richmond, Virginia projects; Finch worked out of his home office in Virginia; Finch bid on the Mutual Building Project, which is located in Virginia and forms the basis for the bulk of the allegations in the Complaint; and Finch now manages the Mutual Building Project in Virginia on behalf of Trifecta.  (ECF No. 3, at ¶¶ 2, 11, 13, 19.)  Absent from the Complaint are allegations of any act taken by Finch in North Carolina other than the fact that he reported to his supervisor in Alloy's Raleigh office.  Based on these allegations, the "last event required to constitute the tort"—*i.e.*, the alleged misappropriation—could only have taken place in Virginia.

29.     Therefore, the Court concludes that Virginia law applies to Plaintiff's misappropriation of trade secrets claim.  Accordingly, given that the NCTSPA does not provide any source of liability for Plaintiff's claim, Defendant's Motion to Dismiss as to Plaintiff's misappropriation of trade secrets claim—which has been brought pursuant to the NCTSPA—is GRANTED, and the claim is DISMISSED.

*ii.     UDTP*

30.     Alloy's second cause of action for UDTP is brought under Chapter 75 of the North Carolina General Statutes.  *See* N.C.G.S. § 75-1 et seq.  (ECF No. 3, at ¶¶ 44–49.)  Defendant argues that this claim should be dismissed because "[u]nder either the *lex loci* test or the most significant relationship test, Chapter 75 . . . does not provide a source of liability" due to the fact that Virginia law applies to this claim.  (ECF No. 14, at p. 7.)

31.     It is currently unsettled in North Carolina whether a UDTP claim—a claim which our courts have described as a "creation of statute . . . neither wholly tortious nor wholly contractual in nature"—is analyzed under the *lex loci* test or the most significant relationship test.  *Stetser v. TAP Pharm Prods. Inc.*, 165 N.C. App. 1, 15 (2004) ("The conflict of law rule regarding the substantive law to be applied to unfair or deceptive trade practices [claims] . . . is subject to a split of authority"); *see also RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at **57 (N.C. Super. Ct. Feb. 18, 2016) (acknowledging the "long-standing, unresolved question regarding the proper conflicts-of-law analysis to apply to a claim brought under North Carolina's UDTP statute").

32.     In *RoundPoint*, this Court addressed whether a plaintiff's UDTP claim was properly brought pursuant to Chapter 75 rather than as a claim under Nevada law. 2016 NCBC LEXIS 18, at **56–59.  *RoundPoint* involved claims brought by a company—RoundPoint Mortgage Company ("RMC")—against several of its former officers and employees "who [were] alleged to have, at various times, taken RMC documents, recruited RMC employees, and otherwise taken improper action to start a competing company: Sebonic Financial ('Sebonic'), a division of Cardinal Financial Company, Limited Partnership ('Cardinal')."  *Id*. at **2.  Notably, in their summary judgment motions, the defendants challenged the viability of RMC's UDTP claim brought against the former employees, arguing that "as Nevada residents, North Carolina's UDTP statute does not apply to them."  *Id*. at **56–57.

33.     After acknowledging the unresolved issue regarding the proper choice of law rule applicable to Chapter 75 claims, this Court deemed it unnecessary to "wade into th[at] debate" given the fact that "either test l[ed] to the application of Nevada law."  *Id*. at **57.  First, with respect to the *lex loci* test, this Court stated that

> RMC's allegations against the [former employees] consist solely of actions taken by them while they worked and resided in Nevada.  There is no issue of material fact that the [former employees] did not undertake any actions outside of Nevada that were related to RMC's claims.  As such, Nevada law was the location of the last act giving rise to RMC's injury.

*Id*. at **57–58.  Second, with regard to the most significant relationship test, this Court observed that

> [d]uring the relevant times, although both RMC and Cardinal maintained headquarters in North Carolina and both [former officers] resided in North Carolina, as to the [former employees], the underlying

> facts have a closer nexus to Nevada. The [former employees] were hired to work in Nevada, spent the entirety of their employment there, and committed the actions of which RMC complains there. The [former employees] remained in Nevada after leaving RMC to join Cardinal and continued to reside there when this action was initiated.

*Id*. at **58. Accordingly, this Court concluded that "the *lex loci* test and the most-significant-relationship test both weigh in favor of the Court's application of Nevada law to RMC's UDTP claim against the [former employees]." *Id*.

34. In the present case, the Court is likewise satisfied that under either the *lex loci* test or the most significant relationship test, Virginia law applies to Plaintiff's UDTP claim.

35. As previously discussed, "under the *lex loci* test, the substantive law of the state where the injury or harm was sustained or suffered, which is, ordinarily, the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place, applies." *SciGrip*, 373 N.C. at 420 (cleaned up). Central to Plaintiff's UDTP claim are the allegations of "Finch's misappropriation of trade secrets"; "Finch's concealment of the ongoing bid process" on the Mutual Building Project "at a time that he was [also] negotiating for or had accepted employment with a competitor"; and "Finch's use of Alloy's confidential information and trade secrets, including but not limited to its specific bid for the Mutual Building Project, to underbid Alloy on behalf of his new employer and competitor[.]" (ECF No. 3, at ¶¶ 45–47.) Indeed, as noted above, the only allegation in the Complaint as to any "act" taken by Finch in *North Carolina* concerns Finch's "weekly or daily communications" with his supervisor in Raleigh. (ECF No. 3, at ¶

3.) All other acts by him—including those alleged to give rise to the UDTP claim—would have occurred in Virginia. Accordingly, based on the allegations in the Complaint, the "last act" giving rise to Plaintiff's UDTP claim could have only taken place in Virginia.

36. Furthermore, with respect to the most significant relationship test, the Court must determine whether North Carolina or Virginia has the most significant relationship to the events giving rise to Plaintiff's UDTP claim. *See SciGrip*, 373 N.C. at 420. Here, although Plaintiff maintained a principal office in North Carolina, Finch lived in Virginia, worked for Alloy from his home office in Virginia, served as Alloy's Senior Project Manager on its Virginia projects, and now works for Trifecta in Virginia. Moreover, the gravamen of Plaintiff's UDTP claim is Finch's alleged actions relating to the bidding process on the Mutual Building Project, which is located in Virginia. Based on the allegations in the Complaint, Virginia—not North Carolina—has the most significant relationship to the events that give rise to Plaintiff's UDTP claim.

37. Therefore, the *lex loci* test and the most significant relationship test both weigh in favor of the Court's application of Virginia law to Plaintiff's UDTP claim. Accordingly, because Chapter 75 does not provide a source of liability for this claim, Defendant's Motion to Dismiss as to Plaintiff's UDTP claim—which has been brought pursuant to Chapter 75 of the North Carolina General Statutes—is GRANTED, and the claim is DISMISSED.

*iii.     Breach of Fiduciary Duty*

38.     Plaintiff's third cause of action is for breach of fiduciary duty.  Once again, our Supreme Court has made clear that the *lex loci* test is applicable to tort claims.  *See Boudreau*, 322 N.C. at 335.  In contrast to Defendant's arguments that Virginia law applies to Plaintiff's first two causes of action, Defendant contends that North Carolina law applies to its breach of fiduciary duty claim.[3] (ECF No. 21, at pp. 6–7.)

39.     In making this argument, Defendant attempts to rely on the internal affairs doctrine.

> The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationship among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.

*Bluebird Corp. v. Aubin*, 188 N.C. App. 671, 680 (2008) (citation omitted).

40.      However, the internal affairs doctrine only applies to officers, directors, and shareholders.  *See Islet Scis., Inc. v. Brighthaven Ventures, LLC*, 2017 LEXIS 4, at \*10–11 (N.C. Super. Ct. Jan. 12, 2017) (declining to apply the internal affairs

---

[3] Defendant presumably takes this position because, as to this claim, North Carolina law is more favorable to his position than Virginia law.  Virginia law recognizes the existence of a general fiduciary duty owed by an employee to his employer.  *See Williams v. Dominion Tech. Partners, L.L.C.*, 265 Va. 280, 289 (2003) (stating that Virginia courts "have long recognized that under the common law an employee, including an employee-at-will, owes a fiduciary duty of loyalty to his employer during his employment").  Conversely, in North Carolina, the general rule is that no such fiduciary duty exists.  *See Dalton v. Camp*, 353 N.C. 647, 652 (2001) (stating that under the general rule "the relation of employer and employee" does not give rise to a fiduciary duty).

doctrine to conduct of "third-party corporate outsiders" because the claims did not involve "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders"). Here, Finch is alleged to simply have been an *employee* of Alloy rather than an officer, director, or shareholder. Defendant has failed to cite any legal authority in which the internal affairs doctrine has been extended to mere employees.

41.     Therefore, for the same reasons discussed above in the Court's application of the *lex loci* rule as to Plaintiff's other claims, the Court concludes that this rule similarly mandates a conclusion that Virginia law applies to Plaintiff's breach of fiduciary duty claim. Moreover, Defendant concedes that Plaintiff has stated a valid claim for breach of fiduciary duty under Virginia law. Accordingly, Defendant's Motion to Dismiss as to Plaintiff's breach of fiduciary duty claim is DENIED.

*iv.     Tortious Interference with Prospective Economic Relations*

42.     Plaintiff's fourth cause of action is for tortious interference with prospective economic relations. Because this claim involves yet another common law tort, the Court must apply the *lex loci* test. *See Boudreau*, 322 N.C. at 335. Once again, the Court concludes that Virginia law is applicable based on the application of the *lex loci* test to Plaintiff's allegations in support of this claim, which the Court has already summarized.

43.     Although Defendant originally argued in the brief in support of his Motion to Dismiss that dismissal was appropriate as to this claim, Defendant's

counsel conceded at the 20 April 2022 hearing that the Complaint states a valid tortious interference claim.[4] Accordingly, the Motion to Dismiss is DENIED as to this claim.

## CONCLUSION

THEREFORE, IT IS ORDERED that Defendant's Motion to Dismiss is **GRANTED**, in part, and **DENIED**, in part, as follows:

1. The Motion is **GRANTED** with respect to the following claims, which are hereby **DISMISSED**:

   a. Plaintiff's first cause of action for misappropriation of trade secrets pursuant to the NCTSPA; and

   b. Plaintiff's second cause of action for UDTP under Chapter 75 of the North Carolina General Statutes.

2. The Motion is **DENIED** with respect to the following claims:

   a. Plaintiff's third cause of action for breach of fiduciary duty; and

   b. Plaintiff's fourth cause of action for tortious interference with prospective economic relations.

3. The Court notes that Plaintiff has requested the opportunity to amend its Complaint in the event the Court rules that Virginia law is applicable. Therefore, in its discretion, the Court hereby grants leave for Plaintiff to file an amended complaint in this action within **thirty (30) days** from the date of this Order.

---

[4] Defendant does not dispute that this claim is recognized under Virginia law.

SO ORDERED, this the 16th day of May, 2022.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge
for Complex Business Cases